**UNITED STATES DISTRICT COURT**

**DISTRICT OF IDAHO**

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) CASE NO. 1:16-cr-00115-BLW |
| | ) |
| Plaintiff, | ) **SENTENCING** |
| | ) |
| vs. | ) |
| | ) |
| STEVEN W. CLYNE, | ) |
| | ) |
| Defendant. | ) |
| | ) |
| _____ | ) |

**TRANSCRIPT OF PROCEEDINGS**
**BEFORE THE HONORABLE B. LYNN WINMILL**
**MONDAY, AUGUST 14, 2017**
**BOISE, IDAHO**

**FOR THE UNITED STATES OF AMERICA**
    Christopher S. Atwood
    US ATTORNEY'S OFFICE
    800 E. Park Blvd., Ste. 600
    Boise, ID 83712

**FOR DEFENDANT**
    Robyn A. Fyffe
    FYFFE LAW
    PO Box 5681
    Boise, ID 83705

Proceedings recorded by mechanical stenography, transcript
produced by computer.
_____

**TAMARA I. HOHENLEITNER, CSR 619, CRR**
FEDERAL OFFICIAL COURT REPORTER
550 WEST FORT STREET, BOISE, IDAHO  83724

<u>I N D E X</u>

AUGUST 14, 2017

| Date | Proceeding | Page |
|------|-----------|------|
| 8/14/17 | Sentencing Hearing | 1 |
| | Recommendations by the Government................ | 20 |
| | Recommendations by the Defense.................. | 39 |
| | Statement by the Defendant...................... | 54 |
| | Court's comments and sentencing................. | 56 |

<u>D E F E N S E   W I T N E S S</u>

PAGE

**JUNE CHRISTINE PETERSON CLYNE**
Direct Examination by Ms. Fyffe........................ 6
Cross-Examination by Mr. Atwood........................ 13
Redirect Examination by Ms. Fyffe...................... 18

P R O C E E D I N G S

August 14, 2017

THE CLERK:  The court will now hear Criminal Case 16-115, United States of America vs. Steven W. Clyne, for sentencing.

THE COURT:  Good afternoon, Counsel.  I need hopefully just a moment to get logged on here.  Counsel, I apologize.  I'm having a little bit of a technical issue here.

Mr. Clyne was convicted by a jury of Counts 1 and 2 of the superseding indictment.  The court ordered a presentence investigation report, which has been provided to court and to counsel.

Let me inquire of the defendant:  Mr. Clyne, have you had an opportunity to review the presentence investigation report?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Okay.  And, Ms. Fyffe, you have gone over the report with your client, I trust?

MS. FYFFE:  I have, Your Honor.

THE COURT:  There were objections filed to the presentence report.  Do either of you intend to call witnesses related to those objections or to anything else?

MS. FYFFE:  Your Honor, I do have one short witness, but she does not pertain to our objections.

MR. ATWOOD:  No witnesses or evidence from the government, Your Honor.

1    THE COURT:  All right.  Ms. Fyffe, do you wish to call

2    a witness or just have someone speak on your client's behalf?

3    If -- unless --

4    MS. FYFFE:  Speaking on -- however the court would

5    prefer.

6    THE COURT:  Well, it's just that it's more a question

7    of whether Mr. Atwood wants to cross-examine the person.  If

8    they want to just make a statement, they can either step to a

9    microphone -- perhaps Mr. Cruser can help us move that

10   microphone over -- or even at the lectern.  But, otherwise,

11   we'll have them placed under oath.

12   MR. ATWOOD:  Judge, I think if it's, you know,

13   character type of stuff, then I don't object to her just

14   speaking from the lectern here or microphone or whatever.  If

15   it's going to be stuff related to objections or stuff that's

16   factually in dispute, then I would prefer that the person be

17   sworn.

18   THE COURT:  Ms. Fyffe?

19   MS. FYFFE:  Mrs. Clyne will testify primarily to her

20   relationship.  She will touch on what their income is right now

21   and the reaction -- the effect on the couple following the

22   conviction.

23   THE COURT:  Okay.

24   MS. FYFFE:  And the -- and her reaction to her

25   inheritance being spent.

1   THE COURT:  All right.  Okay.  Any objection then?

2   MR. ATWOOD:  There could be some potential questions

3   on some of those issues.  So I don't want to make it more

4   complicated, but I guess the government would prefer, then, that

5   she testify.

6   THE COURT:  All right.  Then why don't you call your

7   first witness.

8   MS. FYFFE:  Very well.  The defense calls June Clyne.

9   THE COURT:  Ms. Clyne, would you step before the

10  clerk.  Just come forward, ma'am, if you would.  Step before

11  Ms. Bracke.  She will place you under oath and then give you

12  some directions from there.

13  JUNE CHRISTINE PETERSON CLYNE, DEFENSE WITNESS, SWORN

14  THE CLERK:  Please take a seat in the witness stand.

15  Please state your complete name and spell your name for the

16  record.

17  THE WITNESS:  Okay.  June Christine Peterson Clyne.

18  THE COURT:  Would you spell your last name for the

19  record, if you would.

20  THE WITNESS:  Pardon?

21  THE COURT:  Would you spell your last name for the

22  record.

23  THE WITNESS:  C-L-Y-N-E.

24  THE COURT:  Go ahead, Ms. Fyffe, if you would.

25  MS. FYFFE:  Thank you, Your Honor.

DIRECT EXAMINATION

BY MS. FYFFE:

Q.   June, to start off, can you tell us a little bit about meeting Steve and why you fell in love.

A.   Yes.  I was -- it was in a drama class in high school, and he played a part that he was kind of a jerk in it.  It was in the spring, a "Young Man's Fancy," and all these girls were in love with him.

Anyway, but maybe that's what kind of got me interested in him, is he did such a good job.  Anyway, at the cast party, we got together.  And it seems like after that, we were just kind of connected at the hip.  And we dated for two years and were married in 1965.  We were 18 and 19, very young.

Q.   What about Steve made you fall in love with him?

A.   Mainly because he was a very charismatic, very loving person.  He -- you know, he just radiated, you know, caring and loving people, and that's how he has always been.

Q.   Is that true to this day?

A.   Pardon?

Q.   Is that true to this day?

A.   My hearing isn't so good.

Q.   Well, and I only have half my voice.  I lost my voice.

A.   Okay.

Q.   Is that still true?

A.   Oh, it's probably more true today than ever.

1   Q.   Tell us just briefly about Steve supporting the family.  I

2   understand you mostly stayed home.

3   A.   Yeah.  I -- I did until my youngest son was born, and then

4   we did home daycare, which he was wonderful to those daycare

5   kids, too.

6        Yes, we -- like I said, he has just always been caring --

7   caring of our neighbors, caring of, you know, people in general,

8   people he worked with.  He, you know, couldn't do enough to help

9   people.  Sometimes I would say, "Aren't you going to be home

10  this weekend?"  Well, somebody needs to move or somebody

11  needs -- you know, he was always really caring to everyone.

12  And --

13  Q.   What kind of a father was he?

14  A.   Oh, when we had children, he was a wonderful dad.  I looked

15  forward to him coming home, especially with our first baby.  He

16  was born just a year later, so we were young and no family

17  around.  And he was -- he had had younger brothers and sisters

18  that were real small, so he was really good with babies.

19       And he, like I said, was a wonderful dad at all stages, all

20  stages of raising our kids.  And we -- we loved raising our

21  children.  He is -- I think anybody would be lucky to have him

22  for a dad.  He was that kind of father.

23  Q.   Did at some point Steve lose the ability to be an

24  electrician?

25  A.   Yes, yes.

1  Q.   What effect did that have on him?

2  A.   That was really, really tough.  When he -- like I said, he

3  would work overtime and extra jobs.  He became an electrician.

4  And that was, you know, hard work.  And he would -- you know,

5  sometimes he would do two or three double shifts a week so we

6  could buy our first little house.  He had a down payment when he

7  was not even 22 years old.  And what he did, it was a mill.  It

8  was Kaiser Steel.  It was a pretty rough place to work.

9      But, yeah, it was hard.  He was an electrician and a good

10  one, and it was really hard when he had to have his knees

11  replaced.

12  Q.   Had he thought he could work forever or something?

13  A.   Yeah.  He just thought he could always make the extra money

14  that he, you know, needed or wanted to make by working overtime

15  or doing side jobs.  Like I said, he was, you know, an

16  electrician at -- a journeyman electrician at only 22.  So he

17  always worked hard, worked hard for our kids.

18      And he had had kind of a hard childhood, so he probably

19  overdid, if anything, with our kids.  But he was a wonderful

20  dad.  He was a wonderful husband, always caring.  I mean,

21  because we were so young, we are best friends.  And he has made

22  some mistakes; and, you know, we all do.  By the time you're 70

23  years old, you are going to.

24  Q.   So, June, I'm going to jump way ahead.  The court heard

25  Steve talk about going overboard with your inheritance.

1    A.    Yeah.

2    Q.    Could you tell the court how you realized where your

3    inheritance was going.

4    A.    Yeah.  That -- that was really hard.  Steve -- you know, I

5    was working a little part-time job to try to help us out because

6    he had, you know, sold cars for a little while, tried a few

7    other things, and he was driving bus at the time, too.  And

8    anyway, he got -- when my mother passed away, my dad had died

9    just a couple years before that, and he had a lot of guns.  He

10   was an avid -- you know, a lifer NRA guy.

11   Q.    Your father or Steve?

12   A.    No.  My dad.

13   Q.    Okay.

14   A.    And so we had a lot of guns, and he had done a lot, you

15   know, with Steve because he didn't have a dad to do those things

16   with him.

17         And anyway, so he always loved guns and had done some gun

18   shows when our kids were young, and so he wanted to sell some of

19   this -- all this stuff that my mother wanted out of the house.

20   So he went back to doing some gun shows, and he loved it.

21         And we have a son who was an Airborne Ranger.  And, you

22   know, he was a -- the kids all loved survival stuff.  Our kids

23   are survivalists, too.  They do a lot of --

24   Q.    So how did you -- how did you discover --

25   A.    I discovered it by going to one of the shows, and he

1  had -- it started out with just like four or five tables, and he

2  ended up with, you know, nine tables -- not of guns but of all

3  the accessories and lots of backpacks.  And he had lots of -- he

4  had, you know, accessories for guns, but that was, you know,

5  pretty much what he did.

6  He would sell his jewelry there, too.  So every table --

7  you know, every time there was only a table or two of guns.  But

8  I saw that there was more.  I said, "Well, I thought you were

9  selling them, trying to get rid of them, and they seem to just

10  come back like a bad boomerang."

11  Anyway, I got very upset.  And he let me know that he had

12  spent, you know, a lot of this money on guns, and he was trying

13  to get my money back.  We had a big fight, the only one we

14  really had in, you know, 50 -- almost 52 years over this.  And

15  it was a tough, you know, situation.

16  And -- but he was having a lot of health issues at the

17  time, and he was on some medication, I think, that he didn't --

18  he didn't really think clearly.

19  Q.  Did you state your opinion on whether he should keep buying

20  or not?

21  A.  Oh, yes.  Oh, yes.  Yeah.  I'm no saint.  I was very upset.

22  That was supposed to be -- we were going to buy a house that we

23  could rent out or something for some income because he had

24  no -- we had no -- nothing but our retirement, our social

25  security; that was all we had.  And, of course, it was -- it

1  caused a lot of trouble.

2  And, you know, we have always helped our kids a lot, too.

3  So we were down on our money situation anyway.  And for him to

4  have done that -- he said, "I'm going to make it back.  I will

5  do it."  You know, and then he knew he was going to have to sell

6  out.  He could hardly walk.  And I think that that was seeing --

7  if anyone was attending gun shows, they could see that he could

8  hardly get around.

9  Q.  June --

10  A.  So -- yeah.

11  Q.  -- you mentioned income.  Could you tell me about your

12  financial -- what income do you receive right now?

13  A.  Right now, all we have coming in is I have $700 a month

14  that I get for social security.  I didn't work that long.  And

15  Steve has, like, almost 15-, I think, 1400, something like that,

16  that he gets.  And I do a little -- a little extra job.  I work

17  as a special needs monitor for, you know, the special needs

18  kids, which I make about 1,000 a month.

19  Q.  Is that a --

20  A.  That's only -- that's only, what, about -- I guess what

21  ends up being about 7 months of the year is all.

22  Q.  Is it your understanding -- what's your understanding of

23  what will happen to Steve's retirement income if he is

24  incarcerated?

25  A.  Oh, yes.  That's -- yeah.  I heard that, and it's -- yeah.

1     That would be really a hard thing because that would mean I

2     would be living on $700 a month, because they stop that when

3     they put someone in prison.

4     You know, and this is hard -- this has been very hard

5     because, you know, we didn't -- we have never had any problems

6     like this or have friends that have had problems like this in

7     our lives.

8     Q.   Do you have any friends who are felons?

9     A.   No.  No, I don't.

10    Q.   How -- how has it been for you having a felon husband?

11    A.   Of course, it's pretty hard.  It's really hard.

12    Especially, you know, you have been your whole life with

13    somebody and -- you know, I mean, it's hard to think that what

14    he has done he certainly didn't mean to do.

15    Our children would tell you he is very -- you know, you

16    can't -- if you ever would short anybody -- he would get upset

17    if I wouldn't leave a big enough tip if we went out to dinner.

18    He said, "No, I'll do the tipping."  That's the kind of person

19    that he is.

20    Of course, it's been very upsetting, go to church -- we're

21    good LDS people.  And at this point, the fact that he had to be

22    charged as a felon, and if he goes to prison, he will be

23    excommunicated from the church even for this terrible thing that

24    he did.

25    Q.   Okay, June.  I don't have any more questions for you.

1    A.    Pardon?

2    Q.    I don't have any more questions for you.

3    A.    Thank you.

4          THE COURT:  Mr. Atwood.

5                    CROSS-EXAMINATION

6    BY MR. ATWOOD:

7    Q.    Good afternoon.  I do have just some questions about the

8    financial stuff you talked about.

9    A.    Uh-huh.  I will be glad to tell you.  I have paperwork

10   there, too, if you need to look at it.  I brought it from -- so

11   I have got it all from Jacob Hewlett, who was my mom and

12   dad's -- what do you call it -- financier -- financial --

13          THE COURT:  Just answer the questions as asked.

14          THE WITNESS:  Oh, yes.  Thank you.  I will be glad to.

15   Sure.

16   Q.    BY MR. ATWOOD:  As I understood your testimony, right now

17   you have about $2,200 coming in in social security?

18   A.    Yeah.  That's it.  Nothing else.

19   Q.    Is the house paid for?

20   A.    Yes.  With that money that I got, it was paid off and -- it

21   was paid off with the money that I got -- in fact, the week

22   after I got my money from the inheritance, that's what I did do

23   with the biggest part of it is pay our house off.

24   Q.    And how much was the inheritance?

25   A.    The inheritance was about -- it was around 300-, 400,000.

1    Yeah.

2    Q.   I'm sorry.  300 or 400?

3    A.   Close in that range.  Because we got part of it coming in

4    on a monthly thing before my mother passed away.  So, yeah, it

5    was -- it was a big amount.  It was enough to pay off our house.

6    And that was, you know, almost 300,000 of it there.

7    Q.   Okay.

8    A.   So he paid -- I would say that he spent at least 125-, 50-,

9    on guns.

10   Q.   Well, were you with him when he purchased the guns?

11   A.   Pardon?

12   Q.   Were you with him when he purchased the guns?

13   A.   I had been into gun stores with him before.  I have.

14   Q.   But you weren't with him when he purchased all of them?

15   A.   He would often go in looking for accessories and stuff as

16   much as anything else.

17   Q.   I guess my question is -- you're saying you are estimating

18   what you think he spent on the guns.  But my question is:  You

19   really don't know because you weren't with him when he purchased

20   all the guns; isn't that right?  You're kind of speculating?

21   A.   Well, he couldn't have spent more than we had.  So he paid

22   for them all.  I think you saw that.

23   Q.   It's not my question whether or not the guns were actually

24   paid for before he took them.

25        You don't know how much he actually spent on the guns;

1   isn't that true?

2   A.   Yeah.  It just seemed to me that --

3   Q.   No, no.  It's just a yes-or-no question.  I'm sorry.  I'm

4   not trying to --

5   A.   Oh, no.  I didn't know exactly.  No, I didn't.

6   Q.   All right.

7   A.   I'm sorry.  I didn't understand exactly what you were

8   getting at.

9   Q.   That's all right.

10      Now, at the time of the search warrant, you had at least

11   two Cadillacs there at the house.

12      Did you guys have some Cadillacs?

13   A.   No.  We have one Cadillac.  It is a -- we paid $8,000 for

14   it.  It was a used one.

15   Q.   Hold on.

16   A.   It's a 2005.

17   Q.   Hold on.

18      THE COURT:  Just a moment.  If you will listen

19   carefully to counsel's questions, typically they can be answered

20   yes or no.  And if Ms. Fyffe feels there is a need for you to

21   follow up, she will give you a chance to do so on redirect.  But

22   it will just go a lot more quickly if you just answer the

23   questions as they are asked.

24      THE WITNESS:  Okay.

25      THE COURT:  So just a moment.  Let's --

1        THE WITNESS:  Yes, we have one Cadillac.

2        THE COURT:  Just a moment.

3    Mr. Atwood, put a new question before the witness, if you

4    would.

5    Q.   BY MR. ATWOOD:  Were there two Cadillacs there on the

6    occasion when the search warrant was −− when the agents searched

7    your house?

8    A.   I do not remember.  That's been about three years ago.  I

9    don't remember what was there.  I came in, and it was really

10   shocking, especially when I was frisked.

11   Q.   Do you own a Cadillac now?

12   A.   I own my −− no.  I don't really own it because we're paying

13   payments on it.

14   Q.   Did you own a Cadillac −− a different Cadillac prior to

15   that?

16   A.   Yes, we did.

17       Usually people own cars, and they have to −− they get rid

18   of them.  They were old.  We have always driven them several

19   years and bought them old.

20   Q.   Well, that's my −− so is it possible you had two Cadillacs

21   there at the time during the search warrant?  You said you

22   didn't remember −−

23   A.   I don't know.

24   Q.   −− how many cars you had.

25       (Court reporter interruption.)

1          THE WITNESS:  I do not know.

2          THE COURT:  Okay.  Just a moment.

3          THE WITNESS:  I don't remember what was there.

4          THE COURT:  Okay.  Okay.  Just a moment.  Just a

5    moment.

6          Mr. Atwood, let's just, again, ask a yes-or-no question.

7    And the witness has indicated she doesn't recall so let's move

8    on.  I think she has indicated they do own one Cadillac.

9          And please don't --

10          THE WITNESS:  Yes.  I'm sorry.

11          THE COURT:  I know.  But don't volunteer statements;

12    just answer the questions.

13          THE WITNESS:  Okay.  Yes, I will.  I'm sorry.

14          THE COURT:  Mr. Atwood.

15   Q.   BY MR. ATWOOD:  At the time of the search, your husband was

16   driving an SUV; is that correct?

17   A.   Yes, a 2004 SUV.

18   Q.   Do you still have that SUV?

19   A.   No.  He doesn't have that one anymore.  He has one that I

20   think we paid --

21          THE COURT:  Again, the question can be just "yes" or

22   "no."

23          THE WITNESS:  Yes.  Yes, and he had an SUV.  Yes.  He

24   had two.

25   Q.   BY MR. ATWOOD:  Did you since get rid of that SUV?

1    A.   Yes.  Yes.  He wasn't doing gun shows anymore.

2    Q.   Okay.  It looks like a newer model Expedition, Ford

3    Expedition you are driving now.

4         Did you get a new Expedition since the search?

5    A.   Yes.  We have a 2004 Expedition.  Mm-hmm.  That's all we

6    have.

7    Q.   Okay.

8    A.   And we both -- we were making payments on both of them.

9    Q.   You have answered my question, ma'am.

10             MR. ATWOOD:  Thank you, Judge.  That's all the

11   questions I have.

12             THE COURT:  Ms. Fyffe, any redirect?

13                       REDIRECT EXAMINATION

14   BY MS. FYFFE:

15   Q.   Just one clarification, June.

16        Did I understand correctly that the total inheritance was

17   3- or 400,000?

18   A.   Uh-huh.

19             THE COURT:  Yes or no.  I'm sorry.  The court

20   reporter --

21             THE WITNESS:  Like I said, my sister is here, too.

22   Maybe she would have a better idea.  But, yes, it was over a

23   certain period of time.  But what I gave you there shows

24   what -- what we got after my mother passed away besides my

25   share.  I had to share three ways with my house.  I paid off the

1    house.

2    Q.    BY MS. FYFFE:  And you used part of that money to pay your

3    house off?

4    A.    Yes.

5    Q.    And then was there an additional amount that was --

6    A.    Yes.  But we were going to try to find a little house to

7    rent out.  And all of a sudden, you know, Steve had put it into

8    something he shouldn't have.

9    Q.    Very good.

10   A.    Yes.  And it was hard, I will certainly admit.

11   Q.    No further questions, June.  Thank you.

12            THE COURT:  Anything else, Mr. Atwood?

13            MR. ATWOOD:  No, Your Honor.

14            THE COURT:  All right.  Ms. Clyne, you may step down.

15   Thank you.

16            THE WITNESS:  Thank you.

17            THE COURT:  Any further witnesses?

18            MS. FYFFE:  Not from the defense, Your Honor.

19            THE COURT:  Any rebuttal, Mr. Atwood?

20            MR. ATWOOD:  No, Your Honor.

21            THE COURT:  All right.  Then I'll hear the arguments

22   and recommendations of counsel starting with the government,

23   Mr. Atwood.

24        Mr. Atwood, did I -- you filed two memoranda; one suggested

25   a 30-month and the other a 41-month sentence.  Was that just a

1    typographical error that you corrected with the second filing,

2    or was there a change of heart?  Or maybe I misread it, frankly.

3            MR. ATWOOD:  No.  That's correct, Your Honor.

4        I mean, frankly, I think that -- I think that showed the

5    struggle that the government has had in this case.  We have had

6    a difficult time actually deciding what -- you know, what the

7    proper sentence to recommend to the court would be.

8        There was also some, I guess, miscommunications within my

9    office.

10           THE COURT:  That's fine.  I just wanted to get a sense

11   of that.  So go ahead.

12           MR. ATWOOD:  Your Honor, typically I would --

13   Your Honor usually makes the rulings on the objections before I

14   give my argument.  I don't think we need to in this case because

15   there is no plea agreement, but did you want to hear argument as

16   to the objections first and make rulings or --

17           THE COURT:  I've gone both ways.  In this case, I will

18   hear -- you can make both the arguments and your

19   recommendations.  I don't think my ruling is going to affect

20   your recommendation.

21           MR. ATWOOD:  Okay.

22           THE COURT:  Likewise, Ms. Fyffe, I'll expect you to go

23   ahead and just address the objections and make your

24   recommendation to the court.  Okay?

25           MS. FYFFE:  Yes, sir.

1          THE COURT:  Go ahead.

2          MR. ATWOOD:  Your Honor, the -- neither party is

3   calling -- or presenting evidence on the objections, so I'll

4   give my argument.  The court has all the facts, you know, a lot

5   of the facts in front of it, so I don't want -- I'm trying to

6   avoid being too detailed in my argument.

7          THE COURT:  No, I think there has been enough

8   presented.  I can clearly resolve those objections.  I heard the

9   trial testimony, and then there has been supplemental

10  information provided on a couple of the points.  So just go

11  ahead and proceed.

12         MR. ATWOOD:  Okay.

13     Your Honor, to start with, the government does not object

14  to the presentence report, and the court is aware of that.  The

15  defendant has the two objections, and the government asked the

16  court to overrule both those objections.

17     The first objection relates to the number of firearms

18  involved in the offense.  The evidence introduced at trial

19  proves the number far exceeds 200 firearms, and so we think that

20  the presentence report is accurate.

21     As I have noted in my briefing, there is a number of

22  exhibits, evidence that supports that.  Exhibit 1108 I think is

23  perhaps the easiest exhibit and most directly on point.  That

24  exhibit proved that the defendant purchased 325 firearms.

25  Agents searched the defendant's residence, and 27 were left in

1    his inventory.

2    There was some testimony presented at trial by the

3    defendant about a number of firearms being gifts. Frankly, on

4    direct examination, it was fairly vague and not real specific.

5    On cross-examination, he did admit that there were only

6    approximately 15 guns that were gifts. And so, again, we're

7    well over the 200 firearms involved in the offense.

8    I would also point out 104 of the guns were Hi-Points. The

9    defendant admitted during trial that he was selling --

10   purchasing those firearms, those Hi-Points, to sell at the gun

11   shows because they were selling like hotcakes. So that's 104 of

12   them.

13   But out of the other guns that were both recovered in his

14   inventory or purchased by the undercover agents, most of them

15   were not Hi-Points. So I think there is evidence that he was

16   selling a significant number of the other guns.

17   Exhibit 1103 shows that out of 46 guns, only two of those

18   were Hi-Points. Those were the ones that were, again, seized

19   out of his inventory or purchased by the agents.

20   The same goes for the crime guns recovered. There were

21   some Hi-Points involved in those crime guns, but many of them

22   were not Hi-Points. So there is ample evidence the defendant

23   was buying and selling many types of firearms and not just the

24   Hi-Points.

25   In fact, at trial, the 324 firearms that I mentioned is

just based on a number of I think it was 9 different FFLs.  And during the trial testimony, the defendant admitted in his testimony as well there was other evidence that he purchased guns at numerous other FFLs; Walmart he admitted, Fred Meyer; there was additional ones.

So the number of 324 is actually a much -- is a lower number than the number he was actually buying and selling.

And then, finally, I would just point out the defendant is not required to present any evidence, but he has the opportunity to do so.  And so if there were 100 or 200 guns that were gifts or things that he bought for himself that -- guns that he has, it would be quite easily presented as evidence -- for the defendant to present evidence.

We have the serial numbers, the make, and model of the guns that were purchased at the FFLs.  So if he chose to bring those to court or otherwise show that he still possessed those firearms and wasn't buying them to resell them, he would have that opportunity to do so.  Again, he is not required to, but he has the ability to rebut the substantial evidence, the overwhelming evidence that's been presented by the government.

On the second objection, the objection was that the defendant has accepted responsibility and should get a two-level reduction.  The government disagrees again with that objection. I would point out it's the defendant's burden to demonstrate acceptance of responsibility.

This case is different than the *Ochoa-Gaytan* case that was cited by counsel in their briefing, and we have addressed that I think in detail. But that court also noted that the difference between requiring the government to satisfy its burden and falsely denying criminal conduct is crucial. And that's the difference of what we have here.

In the other case, the *Ochoa-Gaytan* case, the defendant merely put the burden -- the government to its burden at trial, didn't present any evidence, didn't assert things or contradict the elements, simply sat back and put the government to its burden. And that's far different than what we have here.

In this case, the defendant did present evidence, numerous witnesses and himself. He presented evidence, frankly, denied -- falsely denied criminal conduct. The court sat through trial, and so, again, I won't go through it in detail.

But he essentially testified that what he did wasn't willful; that he didn't know that he needed a license; that he didn't know that it was a violation of law what he was doing. That wasn't consistent with the facts. That was also not consistent with the jury's finding in this case. And so that alone was a false denial of criminal conduct on his part.

There were numerous other inconsistencies. He denied that he bought the Hi-Point firearms at Larry's Sporting Goods in order to sell them to the undercover officer. That was as it relates to Count 2. There was a lot of testimony on that point

during cross-examination where he would try to claim that he didn't really buy the guns for the special -- the undercover agent; that he was just buying them to sell at the gun show; you know, might sell them to the undercover agent if, in fact, he had the money or whatever.

More inconsistent testimony when he denied going back to Larry's gun store to buy more guns. There was an audio recording where he told the undercover officer, "Hey, I went back there to buy more guns later that day right afterwards, and they were all out" -- or he says, "They wouldn't sell them to me." And his testimony at trial was very inconsistent with that.

Again, as it relates to Count 2, he falsely denied criminal conduct. He testified that when he -- the court heard the audio recording that was admitted, the exhibit, where on the audio recording, Special Agent Kondo is talking about some friends that he is going to bring to the gun show. This is after the defendant has already sold him the Hi-Points for Special Agent Kondo's friends.

So when Special Agent Kondo mentions that he is bringing some guns -- some friends to the gun show, the defendant sort of pulled him aside and says, "Hey, just so -- you know, just so you know, you need to mark 'yes' when it asks if you're the actual buyer. You just always want to mark 'yes.'"

And then he goes on to tell him, "It doesn't matter for me,

1    but if someone else was here -- overhears us, then they are

2    going to want to tell on us."

3        So the defendant's testimony on that issue at trial was not

4    believable and inconsistent with the facts.  Again, he basically

5    testified that he -- you know, he didn't -- all he was doing to

6    Special Agent Kondo was simply telling him, "Hey, if you are

7    buying the gun and you're the actual buyer, then you should

8    check 'yes.'"

9        He had no explanation as for why he would -- you know, the

10   second part of it is if someone overheard him, they would want

11   to tell on us.  Actually, his -- the defendant's explanation had

12   something to do with why the other gun dealers at the show were

13   going to be jealous of him and some other things.  It really,

14   again, wasn't believable and didn't make a lot of sense under

15   the circumstances.

16       Your Honor, the government believes he continues to deny

17   his conduct and argue that it's not willful.  He also minimizes

18   and denies the relevant conduct, including the number of guns

19   involved in the offense.  So it's, again, clear to the

20   government that the court should overrule both of those

21   objections, that he does not -- he is not entitled to acceptance

22   of responsibility.

23       Before I get to the rest of my argument, I wanted to point

24   out -- clarify the record on one point.  And that is, on page 12

25   of the defendant's sentencing memorandum, the defendant makes

1    the claim that the government has impermissibly commented on his

2    right to remain silent and claims that he invoked his right to

3    counsel.

4        The government disagrees for a number of reasons.  But,

5    most importantly, *Miranda* rights apply when someone is in

6    custody, and the defendant was never in custody during his

7    conversation with the agents.  Counsel has never filed a motion

8    to suppress and never argued that to the court.  And just the

9    clear facts in this case are the defendant was not in custody.

10   So, frankly, *Miranda* doesn't apply.

11       Beyond that, it's not clear that the defendant invoked his

12   right to remain silent.  And beyond that, he made a number of

13   statements that were unsolicited by the agents, just spontaneous

14   statements.

15       So, again, we certainly disagree with the allegation by

16   defense counsel that we're impermissibly commenting on his right

17   to remain silent.  That issue has never been before the court.

18   Counsel has never filed a motion claiming as such.

19       In fact, the government had listed on its exhibit list a

20   number of audio-recordings that we thought we may or may not

21   introduce.  And the defense counsel still, prior to trial, never

22   filed a motion to suppress and never -- has never argued before

23   that there was somehow some infringement on his right to remain

24   silent or tried to suppress those audio-recordings.

25       But, more importantly, I just want to make it clear:  I'm

1    not commenting on any right to remain silent.  Our argument to
2    the court was about what the defendant has said.
3         The argument that they are referring to is that the
4    defendant testified -- well, let me back up.
5         When the agent questioned him during the search, they
6    pointed out to him:  Hey, the repetitive purchase and resale of
7    firearms without a federal firearms license is against the law.
8         And the defendant didn't remain silent at that point.  He
9    started making excuses:  "Well, hey, that's not what I'm doing."
10   "I buy them."  "I play them with them."  "I mess around with
11   them."
12        So it wasn't a right to remain silent.  He made statements
13   at that point, and he never claimed that he had looked into
14   getting a federal firearms license.  Likewise, at trial, he
15   didn't remain silent.  He testified on that point and testified
16   that he had looked into getting an FFL and on and on.  So he has
17   presented those claims.
18        My argument in my brief was not commenting on his right to
19   remain silent.  It was commenting on the statements that he has
20   actually made.  And our argument is it's simply not credible.
21   His claim that he looked into getting a federal firearms license
22   is simply not credible.
23        And the question -- you know, the jury didn't answer that
24   exact question.  But if his testimony was, "I thought I could do
25   this.  I looked into getting a federal firearms license, and I

thought that I could do this," the jury disagreed with that.

And so I think, in a way, the jury did, you know, make a decision on that fact. So I just wanted to clarify that the government didn't comment on the defendant's silence.

Your Honor, on the 3553(a) factors, I addressed those in our sentencing memorandum. I'll just briefly cover those.

As the court's aware -- you sat through the trial in this case -- the defendant created a substantial risk to the community. He willfully disregarded the firearms -- the system that's in place to keep guns out of the hands of dangerous criminals. The result of that is, in fact, that numerous firearms that the defendant purchased later ended up in the hands of criminals.

We detailed all the crime guns that related; that were, in fact, guns initially purchased by the defendant that ended up at crime scenes. There was 11 guns recovered by police. Frankly, that number continues to grow. One of those guns was discovered after the trial in this case. So that took -- you know, there is the possibility that number will continue to grow.

There were, you know, pistols, rifles, all sorts of different types of firearms that ended up in the hands of convicted felons, drug dealers.

This court sentenced Lawrence Kren, one of those people who was actually a case that I prosecuted that this court sentenced. And Mr. Kren was a convicted felon and a drug dealer. He had

admitted to distributing methamphetamine during the search of his residence. A .45 pistol was found there. And the defendant had purchased -- there were actually two guns found in Mr. Kren's possession that this defendant had purchased. And he had purchased those guns just 58 and 59 days prior to when they were taken and seized in Mr. Kren's possession.

There was another gun that was found at a murder scene in Modesto, California. The government has acknowledged that it was the victim of that murder that possessed the gun, but the victim was a drug dealer who -- essentially it was a drug deal gone bad when he got into a shootout with the people that he was selling the drugs to. They shot him. He returned fire with the firearm that Mr. Clyne had initially purchased and then sold.

That drug dealer was -- again, that was a murder scene. He was killed there.

There was other firearms. There was a firearm that was recovered in the possession of a registered sex offender in Los Angeles, California. Agents found that firearm as well as components to make destructive devices, hundreds of images of -- and videos of child pornography and other things there.

And, again, that -- a firearm seized in his possession was one that the defendant had purchased less than two years earlier.

There was another one that was a fairly short time to crime, and that was a convicted felon just six months after the

defendant purchased the firearm.  There was a pistol and a approximately 3/4 pounds of methamphetamine in the possession of a person -- again, the same person with the methamphetamine and that pistol.  He was a convicted felon.

More crimes in California.  Oakland Police Department gang unit recovered a pistol during a search there with numerous items of drugs.  The time to crime there was about one year and three months before that gun was recovered in Oakland, California.

There was a pistol recovered in 2014 in Castroville, California.  The driver of the vehicle was a convicted felon. He fled from police.  They later -- they caught him.  The firearm was found in the vehicle.  He also had as terms of his probation including gang terms, meaning that he couldn't associate with other gangs or gang members.  The time to crime there was about 1-1/2 years.

Some of the guns, as we pointed out, were quite lengthy. There was one quite a ways back that was recovered in Victorville, California, that the defendant purchased some time ago, back in 1992.  That pistol, when it was recovered by the police in California, was actually -- California has a registry as opposed to the federal government, who does not.  But California has a registry, and that pistol was registered to the defendant at the time it was recovered.

Those police officers contacted the defendant, and he told

them he didn't know his gun was missing; yet, he had not reported it stolen.

And then, again, after the trial in this case, on April 4, there was a pistol recovered in the waistband of a convicted felon.  So that was a Hi-Point.  That was one of the guns that the defendant in this case testified were selling like hotcakes.

As to the defendant's history and characteristics, which is another factor for the court, the government acknowledges the defendant is 70 years old.  He has no criminal history except for a minor misdemeanor conviction for careless driving.  He has some good family support.  It appears he is -- you know, has some good characteristics about him as kind of -- as I indicated at trial, it's not my job to show that he is, you know, an evil person; it's simply that he is convicted -- has been convicted of committing numerous federal felony offenses.

On the question of his history and characteristics, we do have some -- I guess the government would caution the court and ask you not to give much weight, if any, to the psychological evaluation that was done by Dr. Hatzenbuehler.

First of all, the report shows the source of information that Ms. Hatzenbuehler reviewed was simply the audio -- an audio-recording -- I don't know if it was even the entire audio-recording -- of an interview with Mr. Clyne.  That person didn't review any other documents, knows very little about the case other than what was provided in the collateral interview

1     with the defendant's wife and the defendant.

2         Frankly, the evaluation isn't very helpful.  It states the

3     defendant is of average -- he performed average on many things.

4     He doesn't have any deficits or anything.  Sort of performed

5     average.

6         Ms. Hatzenbuehler -- Dr. Hatzenbuehler kind of makes some

7     pretty noncommittal conclusions, such that the defendant appears

8     to have -- his compulsive buying appears to have an addictive

9     quality.  Again, even if that's true, it doesn't mitigate the

10     offense.  It wasn't the buying of firearms that made it illegal;

11     it was him selling them without a license.

12         Ms. Hatzenbuehler goes -- Dr. Hatzenbuehler goes through,

13     and again almost all of the conclusions that she makes is that

14     the defendant appears to lack the ability to reflect and

15     integrate consequences; the circumstances in this case appeared

16     to have resulted from poor decision-making.  He doesn't appear

17     to demonstrate any malicious motives.  It's clear the doctor

18     really didn't have a whole lot of facts to make these

19     conclusions and doesn't really commit one way or another.

20         Again, I guess the point that the defendant -- she states,

21     "Mr. Clyne does not appear to demonstrate any malicious

22     motives."  I'm not sure what she means by that.  If she meant

23     that he intended to hurt someone, I don't -- the government

24     isn't saying he intended to hurt someone; rather, that he was

25     just indifferent as to the consequences.

1   This crime was motivated entirely by greed; and as long as

2   he got paid for the guns that he was distributing, he didn't

3   care what happened with the firearms.  So we are not arguing he

4   did this hoping someone would be hurt; it was just pure greed,

5   and he didn't care what happened with the firearms after that.

6   Your Honor, the government has struggled with whether or

7   not a downward departure is appropriate due to the defendant's

8   age and physical health.  As you know, the guidelines in

9   Section -- Guideline 5H1.5 provides that age may be a reason to

10  depart downward in a case in which the defendant is elderly and

11  infirm.

12  Physical condition, it talks about whether individually or

13  in combination with other characteristics is present to an

14  unusual degree and distinguishes the case from typical cases.

15  The government acknowledges, again, the defendant is 70 years

16  old.  He has some health problems.

17  I don't think the court could conclude that he is infirm.

18  He has got, you know, carpal tunnel and diabetes and high blood

19  pressure.  He has some pain.  He has had some surgeries in the

20  past and different things like that.  You know, I just don't

21  know that the court can -- the court could conclude that he is

22  infirm.

23  Likewise on that topic, the government does -- we oppose

24  the defendant's argument that this offense somehow occurred

25  because his health caused his diminished mental capacity.  There

1    is simply no evidence to support his argument such that his

2    sleep apnea or other health problems impaired his judgment.  I

3    think the court would have a hard time concluding that the sleep

4    apnea made him -- you know, made him do these things or -- there

5    is just no evidence to support those things.

6        The defendant also argues he was merely selling firearms to

7    like-minded people who were worried the government would take

8    their firearms away.  Again, we reject that argument for several

9    reasons.

10       First, he simply didn't have a clue who he was selling the

11   guns to.  He didn't ask for name, driver's license, a single bit

12   of information.  I think that was apparent from the trial and

13   the undercover purchases that were made by the agents.  He had

14   absolutely no clue who he was selling the guns to.  He didn't

15   keep many records of that; didn't even ask people their names

16   when they bought the guns, so he can't keep that information.

17       Even if the court were to believe that story that he was

18   selling to like-minded people, it doesn't excuse his conduct in

19   the slightest.  You know, the jury found he willfully violated

20   the law.  So essentially it just means he broke the law because

21   he and others didn't like the law and didn't want to follow it.

22       This case is very good example or good reason why we have

23   laws that require firearm dealers to ensure the purchasers of

24   firearms are not felons or other people who shouldn't have guns.

25   This defendant chose to ignore that system, and the result is

the firearms ended up in the hands of dangerous criminals.

Again, Judge, the jury found that he willfully committed the crime, meaning that he committed the crime knowing that what he did was against the law.

But we understand there is both -- you know, that there are some perhaps mitigating circumstances, but we also think there are some really concerning aspects of this case and that he willfully broke the law. We believe that calls for punishment.

So, in closing, Judge, we do recommend a low-end sentence at the low end of the guidelines. That's 41 months. We also recommend 1 year of supervised release to follow.

I would defer to the court as to any fine. I think the court has an idea. I guess I would note the defendant has a house that's paid for, doesn't have to make those payments as to the house. And I think could -- I think a fine is a potential in this case -- there is a potential for that.

So that's all I have unless the court has questions.

THE COURT: No. That's fine. Thank you.

Ms. Fyffe. Ms. Fyffe, I'm going to give you an insight into what is troubling me about this case. There is no question but that the -- there are a number of factors here which suggest a much lower sentence than what the guidelines would call for. And you know what those are; I don't need to reiterate them except just briefly: health, age, economic impact on his family, lack of prior criminal record.

1                MS. FYFFE:  Correct.

2                THE COURT:  The flip side of this case and what makes

3      this case so difficult -- and I think that's what Mr. Atwood was

4      alluding to -- was almost the sheer volume and the economics of

5      this.  And let me explain what I mean by that.

6          My recollection of the evidence at trial was -- in fact,

7      the Hi-Points, I think, was -- the sale of the Hi-Points was an

8      example in which he said they were selling like hotcakes and he

9      was going to go, I guess, quote, "reup," close quote.  But he

10     wasn't reupping at a wholesale establishment.  He was just going

11     to -- I don't know -- I can't remember if it was Walmart or --

12                MS. FYFFE:  Larry's.

13                THE COURT:  Larry's, wherever -- and buying guns at

14     the same price that anybody else would have paid for them.  If

15     he did get a discount, it was very nominal.  And then go to a

16     gun show and sell them with a substantial markup.

17          Now, what that tells me is not very many people are willing

18     to -- particularly a firearm, which is the kind of thing I would

19     think people would at least investigate somewhat about what a

20     reasonable price is.  So why would someone spend more at a gun

21     show than they would for the very same product they could go

22     down to their local gun store and buy it for quite a bit less?

23     And the answer would seem to be kind of that phrase:  No papers,

24     no tax, no problem -- or no ID, no tax, no problem.  This was

25     simply a way in people who otherwise couldn't obtain guns --

1    because they had a prior felony record, they were drug dealers,

2    they were mentally ill -- could access a gun that otherwise they

3    couldn't access.

4        And that's what puts this case -- makes this case hard

5    because it -- and then, of course, we have evidence that 11

6    firearms were, in fact, found their way into criminal hands, and

7    there is no way of knowing how many there were.  These are the

8    11 that have now been identified through other criminal

9    investigations all over the western United States.

10        That's why I say the economics of this doesn't add up

11   except as a way of just blatantly ignoring the laws that were

12   put in place to protect citizens from drug dealers, criminals,

13   and mentally ill people from obtaining firearms.  So that's what

14   I'm wrestling with here.

15        There is no question but that for that economic issue I

16   just identified, your recommendation would be followed in this

17   case.  But I'm having a hard time with that, given the

18   3553(a)(2) factors that pretty much address protecting the

19   public, providing for adequate deterrence, et cetera.

20        So I try -- at least the party that I think has a little

21   bit of a laboring oar, I always try to let them know what I'm

22   thinking so you know what you need to say in this case.

23        So go ahead.

24             MS. FYFFE:  I appreciate that, Your Honor.  And I'm

25   sorry.  I have had a horrible throat infection, and my voice is

1    still marginal.

2            THE COURT:  Take your time and stay close to the

3    microphone.

4            MS. FYFFE:  But what the court has identified was my

5    biggest challenge throughout the entire case and what took me

6    the longest to wrap my head around.  Because I fully believe

7    Steve is not -- was not intentionally selling to felons.  I

8    don't think that kind of thing is in his radar.  And you spend

9    hours upon hours with him, and you hear him repeat the same

10   beliefs.

11       The court actually identified a number of different

12   factors.  One is the Hi-Points, the guns where he simply went

13   and bought them at perhaps some markdown but not a significant

14   one and then turned around and sold them as-is essentially for a

15   profit.  And I think there is about 100 of those -- there is 104

16   Hi-Points.  And those are the primary guns where he was doing

17   that with.

18       And he started doing that essentially when he realized that

19   he's blown everything on all this -- stupid backpacks and stuff

20   that he is never going to be able to sell, and June hits the

21   roof.  That doesn't make it okay, but -- and it was.  The volume

22   is horrible to -- it's the biggest hurdle to overcome.

23       It's why we're talking about the compulsivity.  If you have

24   somebody -- this didn't start with buying guns simply to mark up

25   and sell.  And he -- this is where I'm struggling.  And I don't

1　　know where the court is coming from, but back in 1992 or 2010,

2　　those guns found then, I don't view that conduct as punishable.

3　　I view Steve as lawfully selling at gun shows as a hobby.

4　　　　He did it once or twice a year.  It wasn't as a main

5　　business.  There weren't 300 guns.  I mean, I don't know how

6　　many he purchased in any given year.  But he is not just buying

7　　and selling them at a mark up there.  He is putting new stocks

8　　on them; he's playing with them; he's putting sights on them,

9　　using them, and then selling them to enhance his collection,

10　　which is directly permissible under 922.

11　　　　And it's from that background, from that origin, that the

12　　conduct in this case derives.  But some of that volume comes

13　　down to that compulsiveness and the addiction; he bought too

14　　much.  And then the economic side comes in when he bought too

15　　much and now he needs to recoup.

16　　　　But it's not a longstanding term, a behavior that goes back

17　　to 1992 where he has been recklessly putting firearms in the

18　　hands of felons.

19　　　　It's -- it's -- I put in my memorandum, I mean, there are

20　　certainly arguments that there should be no private sales of

21　　guns, and there should be -- there should be background checks

22　　for every single one.  But it wasn't the state of the law.  And

23　　for Steve, he is viewing this in a completely different way.

24　　　　You and I -- I don't speak for the court, but when I looked

25　　at -- why else would somebody not want to buy a gun at an FFL?

Why else wouldn't somebody want to do the paperwork?  But this prepper, this doomsday stuff is a very real thing.  And I haven't raised that point as an argument as to why he is motivated to sell, but that's the universe he thinks he is existing in.  It's the universe he had been since the 1970s, where the people he sees at the gun shows are other people like him.

I'm not offering that as -- I mean, what he did he did, and there were a lot of guns, and that's troubling.  But his intentions, his -- the lack of -- it's not callous; it's simply blind.  He didn't get it.  He is seeing this -- this is a man who hasn't -- hasn't seen a drug deal, hasn't seen how firearms work.  And he really does feel horrible that the guns did land in felons' hands.

He believed that the gun shows were the good guys.  And I think there is a -- I think there is a view -- there are people like Steve and like his family who enjoy going to gun shows, who enjoy shooting.  And it's lawful; it's prosocial conduct.  It's not -- it's not on the fringe, the way it might be viewed.  It's the context in which this is still legal.  And the powers that be have been changing and -- that law back and forth, but it's -- his perspective was -- was real.

I'll move back in that as I go through my argument.  I wanted to touch on -- and I guess this ties in.  In terms of the PSR objections I don't have evidence to present.  I did reread

1    the trial testimony.  But the assumption -- the assumption is

2    that every firearm that Steve bought was in furtherance of the

3    offense, but he didn't start out buying firearms in furtherance

4    of the offense.  And if he bought a firearm in 2013 and he puts

5    a sight on it and he dresses it up and then sells it for a

6    profit, does the fact that he has also sold some others clearly

7    as part of the trafficking offense mean that all the guns he

8    purchased were not?  And I view it as I -- Mr. Clyne simply

9    doesn't have the memory to specify each separate gun that he

10    purchased.

11    THE COURT:  But if -- let's say a gun was purchased

12    for $500 and a sight for $300 and they are combined together and

13    sold for $1,000, does that make it any less of a crime that they

14    were sold together?  I'm not sure I'm tracking.

15    MS. FYFFE:  Well, and I'm not sure I'm understanding

16    the whole scheme of the law.  I rely a lot on that pamphlet that

17    I had submitted to the court that says, "Who needs a firearm?"

18    So if he did that very thing and he sold it for a $200 markup,

19    and his intent wasn't to -- primary intent wasn't to profit but

20    was to enhance his collection by turning around and buying

21    something better, then, no, he hasn't broken the law.

22    It's the volume, the mixture and his profit, his intent

23    became primary intent to make profit.  And I think that's

24    clearly shown with those Hi-Points --

25    THE COURT:  But there wasn't a lot of evidence of a

1    lot of sights or other things.

2            MS. FYFFE:  No.  And, Your Honor, he doesn't remember

3    precisely which guns were for what.  And I told him to err on

4    the side of caution.

5            THE COURT:  That's all right.

6            MS. FYFFE:  But I defer to the court in terms of the

7    court's view of the evidence and what the court heard, but that

8    is my argument, and that's why that was raised.

9        He bought a lot of guns, but he also bought a lot of guns

10    earlier in life lawfully to collect, because when Steve buys, he

11    buys a lot.

12        In terms of acceptance of responsibility, I also will defer

13    to the court there.  But I dispute the degree of deception that

14    the government points out, and I don't believe that necessarily

15    follows from the guilty verdict.

16        We agreed with much of the government's case.  We

17    stipulated to many, many records.  We focused on his intent and

18    whether he believed it was lawful.  And whether -- whether that

19    qualifies him for acceptance or whether that's a mitigating

20    factor under 3553(a), he hasn't denied everything.  And we did

21    consciously attempt and work together to make the trial as clean

22    as possible and to simply present his intent on both -- on both

23    those counts.

24        I also want to address the government's comments regarding

25    the *Miranda* issue.  I didn't file a motion to suppress because

there wasn't a *Miranda* violation, and I wasn't seeking to
suppress any statements. The argument of commenting on
Mr. Clyne's right to remain silent is under *Doyle*. There does
not need to be a *Miranda* violation for *Doyle*. And I don't
believe I'm required to file a motion ahead of time to tell the
government not to engage in impermissible comment.

What the *Doyle* is -- and it also doesn't matter if he was
in custody. He was warned to stay silent. And then the
conversation the government is talking about occurs after he
says, "Well, I think I need an attorney," and they start talking
to him about that. And they say, "Well, you know, you have
asked for an attorney," so they are essentially shutting him
down.

And it's not the comment on what he said but his comment on
his own mission, that he didn't talk about the license
application there at that time and to infer he is making it up
now is an impermissible comment on his right to remain silent.

And I did want to draw the distinction. The case I had
cited in my memo draws out the distinction between there doesn't
need to be a *Miranda* violation for there to be a *Doyle*
violation. But that is primarily not an issue before the court
today.

One thing I think is important in terms of the nature of
this offense, I kept thinking of the word "wobbler," which I
believe is technically the term for an offense, such as a DUI,

1    that can either be a misdemeanor or felony.  But it's the word

2    that kept coming to my mind because this firearm offense is

3    different than many of the other crimes, certainly the other

4    crimes I have been in front of this court about.  Theft, whether

5    a theft is a robbery, a home burglary, whether it's an

6    embezzlement scheme.  It's still the same basic wrong; somebody

7    has stolen from somebody else.  There is a basic wrong to

8    society in a theft, no matter what it looks like.

9        The controlled substances are the same thing.  No amount of

10   meth is good.  No amount of meth is prosocial.  It just

11   determines the punishment.

12       And this goes back to what I'm talking about before.

13   Mr. Clyne in 1970s and '80s going to the gun show with his

14   family as a hobby is lawful, and it shouldn't be used against

15   him here.  And it doesn't speak to somebody on the fringe of

16   society.

17       To the contrary, he -- one of the sons has a story where he

18   referenced a police car as a pig, and Mr. Clyne comes unglued

19   that that's not what you call officers and just -- these kids

20   were raised in a law-abiding environment.  They -- their view of

21   this gun show activity is just seen very differently from that

22   of the ATF or from myself, for that matter.

23       Chris, the middle son, the court heard from him.  He has

24   been in the armed forces.  He shared he hadn't -- there is a lot

25   of intricacies in this particular area of the law.  And Steve

had gone well beyond it, but there is a lot of confusion on whether or not something is occasional or frequent or when does it become a primary -- primary goal of making profit versus a hobby.

And what Mr. Clyne was doing before wasn't meant to -- wasn't meant to harm society. It wasn't meant to violate the law. It was meant to be taking part of a healthy activity, something that everyone enjoyed. And in their minds, the people they were interacting with had similar hobbies: liked to buy, liked to collect, liked to shoot.

So it's not -- I'm not sure -- the government didn't say explicitly, but I feel as if we are having something where he started out low back in the day and really worked up, but it's not like if somebody who starts out shoplifting who is 14 and works their way up to some big theft. What he was doing before, it provided the opportunity and his connection with gun shows, but it wasn't a -- he very much has been -- always lived his life as upstanding and hardworking and very much in favor of the law.

And I -- I don't believe he consciously just crossed the line. I do know that he believed that the ATF warned people who needed licenses. And accepting the guilty verdict, then we're looking at the difference between a person who breaks the law because they think they will get a warning.

So a person who travels at a 45 in a 35 because everyone

1    else goes 45 on that road and they have never seen a police

2    officer versus the person who is going 45 even though everybody

3    else is going 35 and they know very well that area is patrolled.

4         The violation he committed violated the same law, but the

5    amount of punishment necessary for deterrence is a key factor

6    there.

7         Mr. Clyne did not believe he was facing felony prosecution.

8    Accepting the guilty verdict as we do today, it was not

9    something he believed that he was going to be sitting here

10   facing prison.  He thought that, at most, he would get warned.

11        I don't believe he was conscious of the sheer volume of the

12   guns he had bought.  His comment to Agent Zimmerman was along

13   those lines.  He bought too many to count.

14        And these -- these pamphlets, the letters that the court

15   recalls that I had at issue in my motion in limine, I am sorry

16   that that stuff came out after Steve's prosecution because I

17   believe outreach here or outreach for people similarly situated

18   would be a really effective way of addressing these types of

19   crimes as opposed to what I think was a typical firearm

20   transaction.  I don't know if I'm just slanted.  But I was

21   listening to one a couple weeks ago that sounded entirely

22   different than Mr. Clyne going on about target shooting and

23   whatnot.  I mean, they sound like criminals making a criminal

24   deal.

25        He is not part of that world.  And I believe it's that

world that those guideline calculations with those numbers were
meant to fit.

And I suppose going back to the court's initial concern,
this case -- in the years I have been practicing in federal
court, I have only had one other case where my client was --
where I found my client to be so much of a different person than
what the investigative materials revealed.  And the other one
was in front of Judge Lodge.

He did not mean to sell to felons, Your Honor.  It's just
not who he is.  I understand all of the bad facts that led up to
it.  I understand why the assumptions the court draws and the
government draws, but it's simply not who he is.

I had submitted a couple articles with the presentence
objections about the seizure of the guns in New Orleans, and
there was a day that -- I had Steve try to explain this issue to
me over time, and there was one where he talked in full
seriousness about the concentration camps out there by Elmore
County that they were going to come round up people and put them
in.  And I thought that sounded absurd.

Then it was the next week, in a letter to the editor, there
was a letter to the editor of a guy talking about his son coming
across similar information and how they worked it into a lesson
about fake news or whatnot.  And I googled it and found it.  I
couldn't believe that there is all this information out there
that makes people -- that makes people like Steve afraid.

1    Steve isn't the pot-stirrer.  He is not out there making

2    political statements, but he -- he is part of the discord of our

3    times.  And he has seen everybody he interacted with through the

4    lens of that perspective, where they all are afraid that the

5    government will be coming for our guns.  And this was, of

6    course, particularly true under the last administration.

7    In terms of Steve's diminished capacity during the offense,

8    it's not a full-sail excuse, no, but nor can it be said that he

9    wouldn't be affected by chronic sleep apnea that's untreated.

10   And I believe that the medical records discussing the degree of

11   severity that are submitted to the court are evidence in a

12   sentencing hearing that establish that, yes, he was affected.  I

13   don't know to which degree.  I didn't have prior testing to

14   compare his memory functioning.

15   But sleep apnea and sleep deprivation is just a matter of

16   common -- even without those records, that people aren't

17   themselves when they have not slept, and that people who are in

18   chronic pain are not themselves.  And that a person who once for

19   years was strong and shoveled coal and worked three jobs at a

20   time all of a sudden can't do anything and what that does to him

21   and his judgment.

22   It's -- it's not a -- I don't offer it as a complete

23   excuse, but it's somewhat of an explanation as to why this man

24   who has lived his life the way he has and who has wanted nothing

25   but to help people has done what he did.

1       And when he talks about -- what they talk about as vague or

2       that he doesn't remember, I don't think he remembers.  He is out

3       compulsively spending.  Even without the sleep apnea, it's --

4       as -- well, as my stepdad ages, anyway, his foibles get worse;

5       his tendencies to do things that are illogical increase.  And

6       the receptiveness to family trying to rein him in not so -- not

7       as responsive to that because he has always been the one that

8       knew better and always been the one that took care.

9       And this is -- this is a -- so, no, he wasn't

10      incapacitated.  But Steve, at the time he is affecting --

11      committing these offenses, is operating well below his prior

12      capacity.

13      And the judge always has people before you that have some

14      sort of impaired capacity because of drugs.  And age is

15      different.  I mean, we age differently, but all of us are going

16      to face the same incapacity at some point or the ones that we

17      love.

18      He had enjoyed competence for such a long time, and the

19      loss of that competence and the weakening into who is here today

20      has just taken a horrible toll on his self-respect, his belief,

21      and it's affected his judgment.

22      And when you're looking at that, you have these reasons.

23      He has the chronic pain.  The medical records show the chronic

24      pain.  The medical records show that he has sleep apnea.  The

25      medical records show he is on pain medication, that he had

untreated issues.  And he made these poor choices then that are
unlike the choices he made before.  And it gives -- it brings
on -- for me, it brings what happened before should count for so
much when the poor choices he made were contributed to by -- by
his body failing him.

I know I don't need to spend much time on the health.  The
court had said it understands.  I strongly dispute that Steve
isn't infirm.  I think that -- I'm not sure what "infirm" means.
I think in Medicaid standards, he is not at nursing home level
of care yet, but he has a number of ailments from incontinence
to -- frankly, what scares me the worst is the recurrent
infections and institutional living.

Seventy, I don't suggest 70 means anything by itself, of
course, or that if you're 70, you're not going to prison.  But
the cardinal truth here, the important truth here for any person
of an advanced age is the inability to regain capacity.  And the
care he'd get in prison over that 41 months would be not
anywhere close to what he would be getting out here.  It would
be the constitutionally sufficient, but we all know that's
different.

It's even -- we're even trained to teach our clients it's
different during the CJA training that the marshals office asks
us to essentially lower their expectations that they are not
going to get the medications they once took and that the
standard of care in a correctional facility is not the same on

1    the outside.

2         You add to that the impact that the conviction has already

3    had on Steve.  Steve is horrified and ashamed and frightened.

4    It's not that if he doesn't go to prison, that this whole event

5    is some slap on the wrist.  This whole process, the charges have

6    been an enormous experience for him and, in and of itself, has

7    made it difficult for him to cope with his health.

8         These are the very circumstances that the departure, even

9    pre*Booker*, that allowed this court to think.  Because four -- if

10   Steve was 40, four years in prison, when he'd come out, he would

11   be a little worse for wear, but he'd probably snap back to it.

12        But for every one year in prison ages you two or three

13   years.  That's a long time for somebody who is already shaky.  I

14   believe he would -- he would come through the process much worse

15   and possibly not be able to live in his own home if he got

16   released.

17        Probation, home confinement all would significantly punish

18   Steve.  He handled himself poorly.  He used very poor judgment.

19   And he failed to recognize his own -- how he was behaving in his

20   own compulsiveness.  He didn't accept guidance from family when

21   he should have.

22        This experience has been beyond humbling for him.  He had

23   never -- the idea of being associated with a felon to him, let

24   alone being one.

25        Steve is not a typical offender.  The volume, as the court

1    noted, is extremely troubling.  That volume represents something

2    different in this case than in a typical case that the

3    guidelines was meant to cover.

4         In his diminished -- the circumstances around the offense

5    and the circumstances now would substantially increase the

6    degree of punishment imposed by prison.  Whatever the length of

7    time punishment that the court would decide is appropriate, I

8    urge the court to please allow it to be served as home

9    confinement in this case.  If the court does impose a term of

10   imprisonment, I do ask for self-surrender.

11        I don't have anything further, Your Honor.

12             THE COURT:  All right.  Counsel, we have been going

13   quite a while.  I want to take a break, but I think maybe

14   I'll -- well, I'll give Mr. Clyne the choice.

15        You have the opportunity to address the court.  You can do

16   so now, and then we'll take a short break afterwards or -- would

17   you rather take a break now?

18             THE DEFENDANT:  Short break, please.

19             THE COURT:  We'll take a ten-minute recess and we'll

20   reconvene, at which time I will hear Mr. Clyne's allocution to

21   the court.  We will be in recess for ten minutes.

22        (Recess at 2:53 p.m. until 3:09 p.m.)

23             THE COURT:  Mr. Clyne, this is your opportunity to

24   address the court, anything you want to say in your behalf.  But

25   you are not obligated to say anything, either.  That's entirely

1    in your prerogative.

2           THE DEFENDANT:  First of all, I would like to

3    apologize to the court for me being in this situation.  It was

4    never my intention to create -- to commit a crime.  I can only

5    apologize to my wife and my family the humiliation this has

6    caused us all.

7       I mean, I have been -- for almost three years, I have been

8    like paralyzed, not being able to do much at all.  I tried to

9    get as many operations as I could done.  I have several I need

10   to do yet.

11      But I just can't apologize enough for doing what I did.

12   And I never intended for a felon to get ahold of one of my guns.

13   I just -- I don't -- I didn't think people who were felons came

14   to the gun shows or would want to get caught with a gun.  I

15   thought there were so many laws against felons.  I did not think

16   about it.

17          And I didn't realize how compulsive I was on all the

18   purchases I made and especially my accessories.  It was too easy

19   to go online for my accessories and hit PayPal.  And then before

20   I know it, the bank account is down.  And I'm going, oh, my

21   goodness, over a period of time.

22          And I just -- I don't know how to apologize enough; I

23   don't.  And I am so sorry.  This was not my intention.  I never

24   thought for a minute I was committing a crime as far as going to

25   a gun show and selling my guns.  That's just -- that's the

1    loophole that I know President Obama was trying to close, but I

2    didn't think it was law yet or that there was any problem with

3    buying guns and selling them.

4         I just -- please don't send me to jail, please.  I just --

5    I just know I can't make it.  I just -- I can barely, barely

6    move now.  I mean, it's -- I sleep sitting up in a chair.  I

7    have to have my CPAP on.  My shoulder is so bad, I cannot lay

8    down.  I just -- my carpal tunnel.  I got operated on, but -- my

9    elbow got operated on, and it's not working quite right.  And

10   they -- my thumb is bad, and my other elbow needs to be worked

11   on.  My neck is still bad.  I still need two or three vertebra

12   reamed out; the calcium and the arthritis has set in.  And the

13   right shoulder needs to be completely replaced.

14        As far as my legs go, I wear compression socks trying to

15   keep the -- I forget what the doctor called it.  You know, it

16   will break open and bleed and pus and stuff.  So we're trying to

17   get that.  And I'm on a lot of antibiotics for that, too.

18        So I'm just a mess.  And physically and mentally, I

19   just -- I'm distraught.  I don't know what to do.  I just -- my

20   wife helps me get dressed in the morning.  She helps me get

21   dressed at night.  She helps me just about with everything.  And

22   I just -- like I said, I'm just so sorry.  I just -- I'm so

23   humiliated.  I'm sorry.

24             THE COURT:  Okay.  Anything else?

25             THE DEFENDANT:  I'm done.  I'm done, Your Honor.

1          THE COURT:  All right.  Thank you.

2     Well, I need to take a few minutes to address -- I guess

3     I'll call it housekeeping matters, that is, the objections to

4     the presentence report.

5          The presentence report concluded that is -- that a

6     conservative estimate for which -- the guns for which the

7     defendant was responsible was 231 firearms, and this resulted in

8     a 10-level increase in the offense level under the guidelines.

9          The argument is made that many of these firearms were

10    purchased lawfully for investment purposes, for personal use,

11    and as gifts for family members.  Of course, the problem is that

12    there was evidence that at least 324 guns, I think, were

13    purchased during the relevant time frame.  I think that was

14    established in Exhibit 1108 during the trial.

15         The evidence at trial also showed that 280 firearms were

16    purchased during the period covered by Count 1, and this was

17    from I think only 9 federal firearm licensees.  And the

18    defendant acknowledged that, in fact, he purchased more than

19    that.  So I think that's a very conservative estimate.

20         Moreover, there is absolutely no evidence that, in fact,

21    the guns were purchased for investment purposes, for personal

22    use or as gifts for family members.  And as Mr. Atwood points

23    out, that could have been readily provable by evidence submitted

24    as part of the sentencing, and none of that was shown.

25         The bottom line is there is just really no evidence that

any of these guns were purchased for any of those purposes.  And
if there was any such purpose, it certainly was a very small
number, a few -- you know, 10 or 20 guns, at most.  And that
clearly would not be enough to cause a conclusion or cause us to
reach a conclusion that, in fact, there was less than 200 guns
that the defendant was involved in purchasing and reselling.

So I'm going to overrule that objection.

There is also an objection to paragraphs 13 and 24 that he
was not given -- that Mr. Clyne was not given a two-level
reduction for acceptance of responsibility.  But the guidelines
are clear that the reduction, only in the most rare case, will
apply when the defendant puts the government to its burden of
proof at trial by denying the essential factual elements of
guilt.

Now, the argument is made that the only thing that the
defendant contested at trial was the question of his intent.
Well, that's because that was the only issue that was left to be
resolved at trial.  There was no question but that he had
purchased the guns and no question that he had sold the guns.

So it really did come down just to his understanding and
his intent.  And I don't think you can dispute the only material
disputed issue in the case and then, after conviction, argue
that you still accept responsibility.

Rather, the only circumstance typically in which that
applies, where you can take a case to trial, is if there is a

1    legal issue that needs to be preserved and the only way of doing

2    so is to go ahead and proceed to trial.

3        So, on that basis, since the defendant has challenged the

4    only real disputed factual issue in the case -- that is, the

5    intent -- and on that basis, I will overrule that objection as

6    well.

7        So the guideline range is 41 to 51 months under the

8    guidelines.  And I will adopt the presentence report as my own

9    findings in this matter.

10       I'm going to briefly address the 3553(a) sentencing

11   factors.  And whenever I have people in the courtroom who don't

12   come to federal court very often, if ever, I try to make sure

13   there is an understanding of the process we go through.

14       It is not just an arbitrary decision by the court to pick a

15   number and then say that's the right sentence.  But, rather, we

16   are required to follow a specific sentencing statute which gives

17   the court certain things to consider; and, not only that, but

18   also how to consider them or how to apply them.

19       At one point, the guidelines were mandatory, and I would

20   have had really no choice in this case but to impose a 41- to

21   51-month sentence.  However, they are now advisory, and I'm only

22   to consider the guideline range along with all the other

23   sentencing factors in fashioning a reasonable sentence.

24       The first factor the court is directed to consider is the

25   nature and circumstances of the offense.  And here, Mr. Clyne

was involved in purchasing at least 231 firearms. I think the numbers were probably far greater than that; probably 400 or more firearms were involved. But, in any event, it's absolutely clear there were more than 200 firearms.

During each of these purchases, Mr. Clyne indicated on an ATF Form 4473 that he was the purchaser of the firearms, and there was a specific -- well, there is a specific warning, as well, about the resale of those guns without being a licensed firearm.

The defendant then sold many, if not -- well, the vast majority of those firearms were then sold without his having obtained a license to do so, which, in turn, would have required that he require purchasers to fill out forms.

The defendant was found guilty of Counts 1 and 2 of the superseding indictment.

The defendant's history and characteristics is obviously a major factor in this case. Mr. Clyne is 70 years old. He has been married for over 50 years and has four adult children, all of whom clearly love their father. And I have reviewed all the letters I received from children, grandchildren, friends, coworkers. There was quite a number of letters sent from different people in his support.

He has no prior criminal history, no history of prior substance abuse. Although obviously suffering some depression due to his current circumstances, the psychological evaluation

1    was completed indicating that Mr. Clyne -- his compulsive buying

2    behavior appears to have an addictive quality to it and that

3    basically there are -- there is a pattern of poor

4    decision-making but no indications that it otherwise has

5    affected his decision where he is no longer competent to make

6    those kinds of decisions.

7        But he has made a series of bad decisions: two

8    bankruptcies, wasting a substantial part of his wife's

9    inheritance.  And it's clear that there is some issues with the

10   defendant's health beyond that, and I think it's probably not

11   necessary for me to review the long list -- long list of health

12   problems that he suffers from along with the many medications

13   that he takes.

14       There is no question but that he has some serious health

15   problems that the court I think should consider in determining

16   what is an appropriate sentence.

17       Finally, the court is to consider factors set forth in

18   18 U.S. Code Section 3553(a)(2).  And these become critical

19   because Congress charges the court with imposing a sentence

20   which is sufficient but not greater than necessary to reflect

21   the seriousness of the offense, promote respect for the law,

22   provide just punishment, adequate deterrence, protection of the

23   public, and any needed educational or vocational training,

24   medical care, or other correctional treatment.

25       And I say it is critical in this case, perhaps more than in

most.  There is no doubt, given the mitigating features of this
case -- that is, Mr. Clyne's age, his poor health, the economic
impact on his wife if he is sent to prison, the lack of any
prior criminal record -- those are clearly substantial
mitigating factors.

But what that is set off against is the terrible problem
that illegal sale of firearms is within our society.  Of those
230 to 300 and some odd number of guns, 11 have already shown up
in the hands of criminals who were arrested or involved in
criminal activity.

And, of course, there is no way to know how many more.  My
best guess is that probably half of those who purchase guns at
these -- from Mr. Clyne were purchasing them because they
couldn't obtain them elsewhere, which means they were either in
this country illegally, they were convicted felons, they were
involved in drug trafficking, they were mentally ill, or were
otherwise disqualified from possessing firearms.

And I will have to say that I cannot accept any suggestion
that Mr. Clyne was not well aware or certainly should have been
aware that that's precisely why he was able to go down to
Walmart, buy a gun essentially at retail, and then resell it at
a substantial markup in a setting where there was no need to
fill out paperwork.

I think that only explanation is that that's why people buy
and sell guns at gun shows at least in volume, as occurred here.

1    There may be occasional sales where people are trying to buy low

2    and sell high, but you can't buy guns at retail and resell them

3    at a gun show unless your purpose is to make a profit by putting

4    guns in the wrong hands.

5        That then requires the court, given the substantial

6    mitigating factors, to try to set a sentence which is, indeed,

7    the lowest sentence I could possibly give for an individual who

8    has been engaged in this kind of conduct.  I think that's

9    dictated by the statutory charge to protect the public and to

10   provide adequate deterrence for the defendant and for others, to

11   impose a just punishment, and to reflect the seriousness of the

12   offense.

13       And I have wrestled with this a lot.  I know Ms. Fyffe has

14   wrestled with it.  I know certainly Mr. Atwood has wrestled with

15   it.  It is difficult, indeed, to try to find what is that proper

16   sentence.

17       But after considering all of the factors of this case, I

18   will impose the following sentence which I find to be reasonable

19   and just and that sentence which, indeed, is sufficient but not

20   greater than necessary to achieve the statutory sentencing

21   objectives I outlined just a moment earlier -- or just a moment

22   ago.

23       Mr. Clyne, if you'll stand, I'll pronounce sentence.

24       The defendant, Steven W. Clyne, having been found guilty by

25   a jury of your peers of Count 1 and 2 of the superseding

1    indictment, and the court being satisfied that you are guilty as

2    charged, I hereby order and adjudge as follows:

3         Pursuant to the Sentencing Reform Act of 1984, it is the

4    judgment of the court that you be committed to the custody of

5    the Bureau of Prisons for a term of 27 months on each of

6    Counts 1 and 2, to be served concurrently with each other.

7         It's further ordered that you pay to the United States a

8    special assessment of $200, which will be due immediately.  I

9    will find that you lack the ability to pay a fine; therefore,

10   the fine will be waived.

11        I think it is unlikely that you will be able to participate

12   in the Inmate Financial Responsibility Program; but if you are,

13   then you will submit nominal payments of not less than $25 per

14   quarter toward the special assessment that I have imposed.  If

15   it is not paid in full at the time of your release from custody,

16   then you will be required to make monthly payments of 10 percent

17   of your gross income but not less than $25 per month during the

18   term of supervised release.

19        Upon release from imprisonment, you will be placed on

20   supervised release for a term of one year on each of Counts 1

21   and 2, all such terms to run concurrently.

22        Within 72 hours after your release from the custody of the

23   Bureau of Prisons, you will report in person to the probation

24   office to which you are released.  Supervised release will be

25   imposed upon the following terms and conditions:

1    First, that you not commit any federal, state, or local

2    crimes.  Second, the court will find that you pose a low risk of

3    future substance abuse so that the drug testing otherwise

4    dictated by statute will be suspended.  You will not possess any

5    firearms, ammunition, destructive devices, or any other

6    dangerous weapons.  You will cooperate in the collection of a

7    DNA sample as directed by your probation officer.  You will pay

8    the special assessment that I have imposed in accordance with

9    the schedule of payments as ordered by the court.

10    You will comply with all general and special terms of

11    supervised release and all standard conditions of supervision as

12    will be outlined in the court's written judgment to be filed in

13    this proceedings.

14    You will also comply with the following special conditions

15    of supervision:

16    You will submit your person, property, house, residence,

17    vehicle, papers, or office to a search conducted by a U.S.

18    probation officer and will warn other occupants that the

19    premises may be subject to searches pursuant to this condition.

20    Mr. Clyne, do you have any questions about the conditions

21    of supervised release that I have imposed?

22    THE DEFENDANT:  No.

23    THE COURT:  I would advise you that if you violate the

24    terms of supervised release, you will be brought back before the

25    court, and a further sentence of incarceration may be imposed.

If you wish to pursue an appeal from the court's decision, you must file a notice of appeal within 14 days after judgment is entered in your case. If unable to pay the cost of an appeal, you may apply for leave to appeal in forma pauperis. If you so request and qualify, the clerk of the court will arrange for legal representation and will prepare and file a notice of appeal on your behalf.

Mr. Atwood, I understand that the forfeiture proceeding -- or the forfeiture aspects of the indictment were resolved through administrative proceedings; is that correct?

MR. ATWOOD: That's correct, Your Honor.

THE COURT: So there is no need for a final order of forfeiture.

I'm going to allow you to -- in fact, let me confirm this. I think we may have just overlooked this.

You can go ahead and be seated, Mr. Clyne. I'll take care of this. I don't want you to be uncomfortable while I'm looking for this.

I am going to allow you to voluntarily surrender. Therefore, it will be ordered that you surrender to the institution designated by the Bureau of Prisons as notified by the U.S. Probation Office.

I would advise you of several things: First, that you must comply with the same conditions of pretrial release that were imposed at the time of your arraignment and applied throughout

1    the time of your -- well, during the pretrial period of this

2    case.  Those same conditions will apply, and you will be

3    required to report on a regular basis to pretrial services and

4    maintain contact with them.  It is through the probation office

5    and pretrial services that you will be notified as to the time

6    and place that you must report to serve the sentence which the

7    court has ordered.

8         I would also advise you that if you violate those

9    conditions of release, the privilege of self-surrender will be

10   revoked, and you will be taken into custody immediately.

11        I would also advise you that it is a separate criminal

12   offense subject to a consecutive sentence if you fail to

13   surrender as ordered by the court.

14        I'll also recommend -- well, Ms. Fyffe, I'm torn about a

15   recommendation for a place of confinement.  Normally Sheridan,

16   Oregon, would be the closest facility.  But with the defendant's

17   health issues, it may be they will want to at least initially

18   have him housed at a medical facility until his health

19   circumstances can be determined.

20        MS. FYFFE:  And in not addressing a specific location,

21   Your Honor, that had been my thoughts.  Everybody wants him to

22   go to the place where his medical needs will be best met.

23        THE COURT:  All right.  Well, all right.  Let me put

24   it this way:  I will recommend placement at a facility as close

25   to southwestern Idaho as possible which would be consistent with

1    his medical needs and leave it at that.  It may be at some point

2    and maybe even initially, it will be determined that Sheridan,

3    Oregon, which is the closest facility to this area, can provide

4    that conditions of confinement, but I'm just not sure of that.

5         I'll also recommend that Mr. Clyne receive credit for all

6    time in federal custody.

7         All right.  Ms. Bracke, Mr. Cruser, did I overlook

8    anything?

9              THE CLERK:  No, Your Honor.

10           THE PROBATION OFFICER:  No, Your Honor.

11           THE COURT:  Anything else, Counsel?

12           MR. ATWOOD:  No, Your Honor.

13           MS. FYFFE:  Just briefly for the record, Your Honor,

14    we object to the sentence imposed and that the (a)(2) factors

15    require a period of incarceration.

16           THE COURT:  All right.  Noted for the record.

17         Mr. Clyne, I wish you the best of luck.  This is not an

18    easy case.  But, you know, you have to also understand that one

19    of the broad jurisdictions this court has is over firearms

20    crimes.  And to see, you know, in an average year, I don't know,

21    50, 75 cases involving illegal possession of firearms, a fair

22    number of those I'm sure came from individuals like yourself who

23    put yourself in a position to make a profit by distributing guns

24    that you had to know would end up in the wrong hands.

25         And I just cannot accept any suggestion that you did not

1  understand that simply because it made no sense that anybody

2  would buy the guns at a gun show unless they were trying to

3  purchase guns that they otherwise would not be able to access.

4      Nevertheless, I wish you and your family the best of luck.

5  I know it's going to be a challenge and difficult for you, but I

6  truly gave you the sentence that was short as I could, in any

7  good conscience, impose in this case.

8      We'll be in recess.

9      (Proceedings concluded at 3:33 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    CERTIFICATE OF OFFICIAL REPORTER

 2

 3

 4

 5

 6              I, Tamara Hohenleitner, Federal Official Realtime

 7    Court Reporter, in and for the United States District Court for

 8    the District of Idaho, do hereby certify that pursuant to

 9    Section 753, Title 28, United States Code, that the foregoing

10    is a true and correct transcript of the stenographically

11    reported proceedings held in the above-entitled matter and that

12    the transcript page format is in conformance with the

13    regulations of the Judicial Conference of the United States.

14

15                         Dated this 25th day of September, 2017.

16

17

18                         /S/ TAMARA I. HOHENLEITNER
                           _____
19                         TAMARA I. HOHENLEITNER, CSR NO. 619, CRR
                           FEDERAL OFFICIAL COURT REPORTER
20

21

22

23

24

25
```

**$1,000** [1] - 42:13
**$2,200** [1] - 13:17
**$200** [2] - 42:18, 63:8
**$25** [2] - 63:13, 63:17
**$300** [1] - 42:12
**$500** [1] - 42:12
**$700** [2] - 11:13, 12:2
**$8,000** [1] - 15:13
**'80s** [1] - 45:13
**'yes** [2] - 25:24, 26:8
**'yes'** [1] - 25:23
**1** [7] - 3:9, 36:11, 56:16, 59:14, 62:25, 63:6, 63:20
**1,000** [1] - 11:18
**1-1/2** [1] - 31:16
**10** [2] - 57:3, 63:16
**10-level** [1] - 56:8
**100** [2] - 23:10, 39:15
**104** [3] - 22:8, 22:11, 39:15
**11** [4] - 29:16, 38:5, 38:8, 61:8
**1103** [1] - 22:17
**1108** [2] - 21:22, 56:14
**12** [1] - 26:24
**125** [1] - 14:8
**13** [1] - 57:8
**14** [3] - 3:2, 46:14, 65:2
**1400** [1] - 11:15
**15** [2] - 11:15, 22:6
**16-115** [1] - 3:4
**18** [2] - 6:13, 60:18
**19** [1] - 6:13
**1965** [1] - 6:13
**1970s** [2] - 41:5, 45:13
**1984** [1] - 63:3
**1992** [3] - 31:20, 40:1, 40:17
**2** [7] - 3:9, 24:25, 25:13, 59:14, 62:25, 63:6, 63:21
**20** [1] - 57:3
**200** [5] - 21:19, 22:7, 23:10, 57:5, 59:4
**2004** [2] - 17:17, 18:5
**2005** [1] - 15:16
**2010** [1] - 40:1
**2013** [1] - 42:4
**2014** [1] - 31:10
**2017** [1] - 3:2
**22** [2] - 8:7, 8:16
**230** [1] - 61:8
**231** [2] - 56:7, 59:1
**24** [1] - 57:8
**27** [2] - 21:25, 63:5
**280** [1] - 56:15
**2:53** [1] - 53:22

**3** [1] - 18:17
**3/4** [1] - 31:2
**30-month** [1] - 19:25
**300** [4] - 13:25, 14:2, 40:5, 61:8
**300,000** [1] - 14:6
**324** [3] - 22:25, 23:6, 56:12
**325** [1] - 21:24
**35** [2] - 46:25, 47:3
**3553(a** [3] - 29:5, 43:20, 58:10
**3553(a)(2)** [1] - 38:18
**3553(a)(2)** [1] - 60:18
**3:09** [1] - 53:22
**3:33** [1] - 68:9
**4** [1] - 32:3
**40** [1] - 52:10
**400** [2] - 14:2, 59:2
**400,000** [2] - 13:25, 18:17
**41** [4] - 36:10, 51:17, 58:7, 58:20
**41-month** [1] - 19:25
**4473** [1] - 59:6
**45** [4] - 30:2, 46:25, 47:1, 47:2
**46** [1] - 22:17
**50** [4] - 10:14, 14:8, 59:18, 67:21
**51** [1] - 58:7
**51-month** [1] - 58:21
**52** [1] - 10:14
**58** [1] - 30:5
**59** [1] - 30:5
**5H1.5** [1] - 34:9
**7** [1] - 11:21
**70** [6] - 8:22, 32:9, 34:15, 51:13, 51:14, 59:17
**72** [1] - 63:22
**75** [1] - 67:21
**9** [2] - 23:1, 56:17
**922** [1] - 40:10
**a)(2** [1] - 67:14
**abiding** [1] - 45:20
**ability** [4] - 7:23, 23:19, 33:14, 63:9
**able** [6] - 39:20, 52:15, 54:8, 61:20, 63:11, 68:3
**absolutely** [3] - 35:14, 56:20, 59:3
**absurd** [1] - 48:19
**abuse** [2] - 59:24, 64:3
**accept** [4] - 52:20, 57:23, 61:18, 67:25
**acceptance** [5] - 23:25, 26:21, 43:12,

43:19, 57:10
**accepted** [1] - 23:22
**accepting** [2] - 46:22, 47:8
**access** [3] - 38:2, 38:3, 68:3
**accessories** [5] - 10:3, 10:4, 14:15, 54:18, 54:19
**accordance** [1] - 64:8
**account** [1] - 54:20
**accurate** [1] - 21:20
**achieve** [1] - 62:20
**acknowledged** [2] - 30:8, 56:18
**acknowledges** [2] - 32:8, 34:15
**Act** [1] - 63:3
**activity** [3] - 45:21, 46:7, 61:10
**actual** [2] - 25:24, 26:7
**add** [2] - 38:10, 52:2
**addiction** [1] - 40:13
**addictive** [2] - 33:8, 60:2
**additional** [2] - 19:5, 23:5
**address** [7] - 20:23, 38:18, 43:24, 53:15, 53:24, 56:2, 58:10
**addressed** [2] - 24:2, 29:5
**addressing** [2] - 47:18, 66:20
**adequate** [2] - 38:19, 60:22, 62:10
**adjudge** [1] - 63:2
**administration** [1] - 49:6
**administrative** [1] - 65:10
**admit** [2] - 19:10, 22:5
**admitted** [5] - 22:9, 23:2, 23:4, 25:15, 30:1
**adopt** [1] - 58:8
**adult** [1] - 59:18
**advanced** [1] - 51:16
**advise** [4] - 64:23, 65:23, 66:8, 66:11
**advisory** [1] - 58:21
**affect** [1] - 20:19
**affected** [4] - 49:9, 49:12, 50:21, 60:5
**affecting** [1] - 50:10
**afraid** [1] - 48:25, 49:4
**afternoon** [2] - 3:6, 13:7
**afterwards** [1] - 25:9, 53:16

**age** [7] - 34:8, 34:9, 36:24, 50:14, 50:15, 51:16, 61:2
**agent** [2] - 25:3, 25:4, 28:5
**Agent** [5] - 25:16, 25:18, 25:20, 26:6, 47:12
**agents** [8] - 16:6, 21:25, 22:14, 22:19, 27:7, 27:13, 30:18, 35:13
**ages** [2] - 50:4, 52:12
**ago** [4] - 16:8, 31:20, 47:21, 62:22
**agreed** [1] - 43:16
**agreement** [2] - 20:15
**ahead** [10] - 5:24, 8:24, 20:11, 20:23, 21:1, 21:11, 38:23, 44:5, 58:2, 65:16
**ahold** [1] - 54:12
**ailments** [1] - 51:10
**Airborne** [1] - 9:21
**allegation** [1] - 27:15
**allocution** [1] - 53:20
**allow** [3] - 53:8, 65:14, 65:19
**allowed** [1] - 52:9
**alluding** [1] - 37:4
**almost** [4] - 10:14, 11:15, 14:6, 33:13, 37:4, 54:7
**alone** [2] - 24:21, 52:24
**America** [1] - 3:4
**ammunition** [1] - 64:5
**amount** [5] - 14:5, 19:5, 45:9, 45:10, 47:5
**ample** [1] - 22:22
**Angeles** [1] - 30:18
**answer** [5] - 13:13, 15:22, 17:12, 28:23, 37:23
**answered** [2] - 15:19, 18:9
**antibiotics** [1] - 55:17
**anyway** [7] - 6:9, 6:10, 9:8, 9:17, 10:11, 11:3, 50:4
**apnea** [6] - 35:2, 35:4, 49:9, 49:15, 50:3, 50:24
**apologize** [5] - 3:7, 54:3, 54:5, 54:11, 54:22
**apparent** [1] - 35:12
**appeal** [5] - 65:1, 65:2, 65:4, 65:7

**appear** [2] - 33:16, 33:21
**appeared** [1] - 33:15
**application** [1] - 44:16
**applied** [1] - 65:25
**applies** [1] - 57:25
**apply** [6] - 27:5, 27:10, 57:12, 58:18, 65:4, 66:2
**appreciate** [1] - 38:24
**appropriate** [2] - 34:7, 53:7, 60:16
**April** [1] - 32:3
**arbitrary** [1] - 58:14
**area** [3] - 45:25, 47:3, 67:3
**argue** [2] - 26:17, 57:22
**argued** [2] - 27:8, 27:22
**argues** [1] - 35:6
**arguing** [1] - 34:3
**argument** [18] - 20:14, 20:15, 21:4, 21:6, 26:23, 28:1, 28:3, 28:18, 28:20, 34:24, 35:1, 35:8, 41:3, 41:23, 43:8, 44:2, 56:9, 57:15
**arguments** [3] - 19:21, 20:18, 40:20
**armed** [1] - 45:24
**arraignment** [1] - 65:25
**arrange** [1] - 65:5
**arrested** [1] - 61:9
**arthritis** [1] - 55:12
**articles** [1] - 48:13
**as-is** [1] - 39:14
**ashamed** [1] - 52:3
**aside** [1] - 25:22
**aspects** [2] - 36:7, 65:9
**assert** [1] - 24:9
**assessment** [3] - 63:8, 63:14, 64:8
**associate** [1] - 31:15
**associated** [1] - 52:23
**assumption** [2] - 42:1
**assumptions** [1] - 48:11
**ATF** [3] - 45:22, 46:21, 59:6
**attempt** [1] - 43:21
**attending** [1] - 11:7
**attorney** [2] - 44:10, 44:12
**Atwood** [13] - 4:7, 13:4, 16:3, 17:6, 17:14, 19:12, 19:19,

19:23, 19:24, 37:3, 56:22, 62:14, 65:8
**ATWOOD** [18] - 3:24, 4:12, 5:2, 13:6, 13:16, 16:5, 17:15, 17:25, 18:10, 19:13, 19:20, 20:3, 20:12, 20:21, 21:2, 21:12, 65:11, 67:12
**audio** [8] - 25:7, 25:14, 25:15, 27:20, 27:24, 32:21, 32:22, 32:23
**audio-recording** [2] - 32:22, 32:23
**audio-recordings** [2] - 27:20, 27:24
**August** [1] - 3:2
**average** [4] - 33:3, 33:5, 67:20
**avid** [1] - 9:10
**avoid** [1] - 21:6
**aware** [4] - 21:14, 29:7, 61:19, 61:20
**babies** [1] - 7:18
**baby** [1] - 7:15
**background** [2] - 40:11, 40:21
**backpacks** [2] - 10:3, 39:19
**bad** [7] - 10:10, 30:11, 48:10, 55:7, 55:10, 55:11, 60:7
**bank** [1] - 54:20
**bankruptcies** [1] - 60:8
**barely** [2] - 55:5
**based** [1] - 23:1
**basic** [2] - 45:6, 45:7
**basis** [3] - 58:3, 58:5, 66:3
**became** [2] - 8:3, 42:23
**become** [2] - 46:3, 60:18
**behalf** [3] - 4:2, 53:24, 65:7
**behaving** [1] - 52:19
**behavior** [2] - 40:16, 60:2
**belief** [1] - 50:20
**beliefs** [1] - 39:10
**believable** [2] - 26:4, 26:14
**believes** [1] - 26:16
**below** [1] - 50:11
**best** [5] - 8:21, 61:12, 66:22, 67:17, 68:4
**better** [3] - 18:22, 42:21, 50:8

**between** [3] - 24:4, 44:19, 46:23
**beyond** [5] - 27:11, 27:12, 46:1, 52:22, 60:10
**big** [4] - 10:13, 12:17, 14:5, 46:15
**biggest** [3] - 13:23, 39:5, 39:22
**bit** [5] - 3:8, 6:3, 35:11, 37:22, 38:21
**blatantly** [1] - 38:11
**bleed** [1] - 55:16
**blind** [1] - 41:11
**blood** [1] - 34:18
**blown** [1] - 39:19
**body** [1] - 51:5
**boomerang** [1] - 10:10
**born** [2] - 7:3, 7:16
**bottom** [1] - 56:25
**bought** [13] - 16:19, 23:11, 24:23, 35:16, 39:13, 40:13, 40:14, 42:2, 42:4, 43:9, 47:12, 47:13
**Bracke** [2] - 5:11, 67:7
**break** [5] - 53:13, 53:16, 53:17, 53:18, 55:16
**breaks** [1] - 46:23
**brief** [1] - 28:18
**briefing** [2] - 21:21, 24:2
**briefly** [5] - 7:1, 29:6, 36:24, 58:10, 67:13
**bring** [2] - 23:15, 25:17
**bringing** [1] - 25:20
**brings** [2] - 51:2, 51:3
**broad** [1] - 67:19
**broke** [2] - 35:20, 36:8
**broken** [1] - 42:21
**brothers** [1] - 7:17
**brought** [2] - 13:10, 64:24
**burden** [6] - 23:24, 24:4, 24:8, 24:11, 57:12
**Bureau** [3] - 63:5, 63:23, 65:21
**burglary** [1] - 45:5
**bus** [1] - 9:7
**business** [1] - 40:5
**buy** [14] - 8:6, 10:22, 25:2, 25:7, 25:9, 28:10, 37:22, 40:25, 46:9, 61:21, 61:24, 62:1, 62:2, 68:2
**buyer** [2] - 25:24, 26:7

**buying** [15] - 10:19, 22:23, 23:7, 23:17, 25:3, 26:7, 33:8, 33:10, 37:13, 39:24, 40:6, 42:3, 42:20, 55:3, 60:1
**buys** [2] - 43:10, 43:11
**BY** [8] - 6:2, 13:6, 13:16, 16:5, 17:15, 17:25, 18:14, 19:2
**C-L-Y-N-E** [1] - 5:23
**Cadillac** [6] - 15:13, 16:1, 16:11, 16:14, 17:8
**Cadillacs** [4] - 15:11, 15:12, 16:5, 16:20
**calcium** [1] - 55:12
**calculations** [1] - 48:1
**California** [9] - 30:8, 30:18, 31:5, 31:9, 31:11, 31:19, 31:21, 31:23
**callous** [1] - 41:10
**camps** [1] - 48:17
**cannot** [3] - 55:7, 61:18, 67:25
**capacity** [5] - 34:25, 49:7, 50:12, 50:14, 51:16
**car** [1] - 45:18
**cardinal** [1] - 51:15
**care** [8] - 34:3, 34:5, 50:8, 51:10, 51:17, 51:25, 60:24, 65:16
**carefully** [1] - 15:19
**careless** [1] - 32:10
**caring** [6] - 6:16, 7:6, 7:7, 7:11, 8:20
**carpal** [2] - 34:18, 55:8
**cars** [3] - 9:6, 16:17, 16:24
**case** [51] - 20:5, 20:14, 20:17, 24:1, 24:7, 24:12, 24:20, 27:9, 29:8, 29:18, 29:24, 32:3, 32:6, 32:25, 33:15, 34:10, 34:14, 35:22, 36:7, 36:16, 36:20, 37:2, 37:3, 38:4, 38:17, 38:22, 39:5, 40:12, 43:16, 44:18, 48:4, 48:5, 53:2, 53:9, 57:11, 57:22, 57:25, 58:4, 58:20, 59:17, 60:25, 61:2, 62:17, 65:3, 66:2, 67:18, 68:7
**Case** [1] - 3:3
**cases** [2] - 34:14,

67:21
**cast** [1] - 6:10
**Castroville** [1] - 31:10
**caught** [2] - 31:12, 54:14
**caused** [3] - 11:1, 34:25, 54:6
**caution** [2] - 32:17, 43:4
**certain** [2] - 18:23, 58:17
**certainly** [8] - 12:14, 19:10, 27:15, 40:20, 45:3, 57:2, 61:19, 62:14
**cetera** [1] - 38:19
**chair** [1] - 55:6
**challenge** [2] - 39:5, 68:5
**challenged** [1] - 58:3
**chance** [1] - 15:21
**change** [1] - 20:2
**changing** [1] - 41:21
**character** [1] - 4:13
**characteristics** [5] - 32:7, 32:12, 32:16, 34:13, 59:16
**charge** [1] - 62:9
**charged** [2] - 12:22, 63:2
**charges** [2] - 52:5, 60:19
**charismatic** [1] - 6:15
**check** [1] - 26:8
**checks** [1] - 40:21
**child** [1] - 30:20
**childhood** [1] - 8:18
**children** [5] - 7:14, 7:21, 12:15, 59:18, 59:20
**choice** [2] - 53:14, 58:20
**choices** [3] - 51:1, 51:2, 51:4
**chose** [2] - 23:15, 35:25
**Chris** [1] - 45:23
**Christine** [1] - 5:17
**CHRISTINE** [1] - 5:13
**chronic** [4] - 49:9, 49:18, 50:23
**church** [2] - 12:20, 12:23
**circumstance** [1] - 57:24
**circumstances** [9] - 26:15, 33:15, 36:6, 52:8, 53:4, 53:5, 58:25, 59:25, 66:19
**cited** [2] - 24:2, 44:19

**citizens** [1] - 38:12
**CJA** [1] - 51:22
**claim** [3] - 25:1, 27:1, 28:21
**claimed** [1] - 28:13
**claiming** [1] - 27:18
**claims** [2] - 27:2, 28:17
**clarification** [1] - 18:15
**clarify** [2] - 26:24, 29:3
**class** [1] - 6:5
**clean** [1] - 43:21
**clear** [8] - 26:19, 27:9, 27:11, 27:25, 33:17, 57:11, 59:4, 60:9
**clearly** [7] - 10:18, 21:8, 42:6, 42:24, 57:4, 59:19, 61:4
**CLERK** [3] - 3:3, 5:14, 67:9
**clerk** [5] - 5:10, 65:5
**client** [3] - 3:17, 48:5, 48:6
**client's** [1] - 4:2
**clients** [1] - 51:21
**close** [6] - 14:3, 37:9, 39:2, 51:18, 55:1, 66:24
**closest** [2] - 66:16, 67:3
**closing** [1] - 36:9
**clue** [2] - 35:10, 35:14
**Clyne** [32] - 3:4, 3:9, 3:13, 4:19, 5:8, 5:9, 5:17, 19:14, 30:13, 32:23, 33:21, 42:8, 45:13, 45:18, 46:5, 47:7, 47:22, 53:14, 53:23, 57:9, 58:25, 59:5, 59:17, 60:1, 61:13, 61:19, 62:23, 62:24, 64:20, 65:16, 67:5, 67:17
**CLYNE** [1] - 5:13
**Clyne's** [3] - 44:3, 53:20, 61:2
**coal** [1] - 49:19
**Code** [1] - 60:18
**collateral** [1] - 32:25
**collect** [2] - 43:10, 46:10
**collection** [2] - 40:9, 42:20, 64:6
**combination** [1] - 34:13
**combined** [1] - 42:12
**coming** [6] - 7:15, 11:13, 13:17, 14:3, 40:1, 45:2, 48:21,

49:5

**comment** [6] - 29:4, 44:6, 44:14, 44:17, 47:12
**commented** [1] - 27:1
**commenting** [5] - 27:16, 28:1, 28:18, 28:19, 44:2
**comments** [1] - 43:24
**commit** [3] - 33:19, 54:4, 64:1
**committed** [4] - 36:2, 36:3, 47:4, 63:4
**committing** [3] - 32:15, 50:11, 54:24
**common** [1] - 49:16
**community** [1] - 29:9
**compare** [1] - 49:14
**competence** [2] - 50:18, 50:19
**competent** [1] - 60:5
**complete** [2] - 5:15, 49:22
**completed** [1] - 60:1
**completely** [2] - 40:23, 55:13
**complicated** [1] - 5:4
**comply** [3] - 64:10, 64:14, 65:24
**components** [1] - 30:19
**compression** [1] - 55:14
**compulsive** [3] - 33:8, 54:17, 60:1
**compulsively** [1] - 50:3
**compulsiveness** [2] - 40:13, 52:20
**compulsivity** [1] - 39:23
**concentration** [1] - 48:17
**concern** [1] - 48:3
**concerning** [1] - 36:7
**conclude** [2] - 34:17, 34:21
**concluded** [2] - 56:5, 68:9
**concluding** [1] - 35:3
**conclusion** [2] - 57:4, 57:5
**conclusions** [3] - 33:7, 33:13, 33:19
**concurrently** [2] - 63:6, 63:21
**condition** [2] - 34:12, 64:19
**conditions** [8] - 63:25, 64:11, 64:14, 64:20,

65:24, 66:2, 66:9, 67:4
**conduct** [11] - 24:5, 24:14, 24:21, 25:14, 26:17, 26:18, 35:18, 40:2, 40:12, 41:18, 62:8
**conducted** [1] - 64:17
**confinement** [4] - 52:17, 53:9, 66:15, 67:4
**confirm** [1] - 65:14
**confusion** [1] - 46:1
**Congress** [1] - 60:19
**connected** [1] - 6:12
**connection** [1] - 46:16
**conscience** [1] - 68:7
**conscious** [1] - 47:11
**consciously** [2] - 43:21, 46:20
**consecutive** [1] - 66:12
**consequences** [2] - 33:15, 33:25
**conservative** [2] - 56:6, 56:19
**consider** [6] - 58:17, 58:18, 58:22, 58:24, 60:15, 60:17
**considering** [1] - 62:17
**consistent** [3] - 24:19, 24:20, 66:25
**constitutionally** [1] - 51:19
**contact** [1] - 66:4
**contacted** [1] - 31:25
**contested** [1] - 57:16
**context** [1] - 41:20
**continue** [1] - 29:19
**continues** [2] - 26:16, 29:17
**contradict** [1] - 24:9
**contrary** [1] - 45:17
**contributed** [1] - 51:4
**controlled** [1] - 45:9
**conversation** [2] - 27:7, 44:9
**convicted** [10] - 3:9, 29:22, 29:25, 30:25, 31:4, 31:11, 32:4, 32:14, 61:15
**conviction** [4] - 4:22, 32:10, 52:2, 57:22
**cooperate** [1] - 64:6
**cope** [1] - 52:7
**corrected** [1] - 20:1
**correctional** [1] - 51:25, 60:24
**correctly** [1] - 18:16

**cost** [1] - 65:3
**Counsel** [2] - 3:6, 67:11
**counsel** [10] - 3:7, 3:12, 19:22, 24:2, 27:3, 27:7, 27:16, 27:18, 27:21, 53:12
**counsel's** [1] - 15:19
**count** [2] - 47:13, 51:3
**Count** [4] - 24:25, 25:13, 56:16, 62:25
**country** [1] - 61:15
**counts** [1] - 43:23
**Counts** [4] - 3:9, 59:14, 63:6, 63:20
**County** [1] - 48:18
**couple** [5] - 4:21, 9:9, 21:10, 47:21, 48:13
**course** [8] - 10:25, 12:11, 12:20, 38:5, 49:6, 51:14, 56:11, 61:11
**court's** [5] - 29:7, 43:7, 48:3, 64:12, 65:1
**courtroom** [1] - 58:11
**cover** [2] - 29:6, 53:3
**covered** [1] - 56:16
**coworkers** [1] - 59:21
**CPAP** [1] - 55:7
**create** [1] - 54:4
**created** [1] - 29:8
**credible** [2] - 28:20, 28:22
**credit** [1] - 67:5
**crime** [13] - 22:20, 22:21, 29:14, 29:16, 30:25, 31:7, 31:15, 34:1, 36:3, 42:13, 54:4, 54:24
**crimes** [6] - 31:5, 45:3, 45:4, 47:19, 64:2, 67:20
**Criminal** [1] - 3:3
**criminal** [13] - 24:5, 24:14, 24:21, 25:13, 32:9, 36:25, 38:6, 38:8, 47:23, 59:23, 61:4, 61:10, 66:11
**criminals** [6] - 29:11, 29:13, 36:1, 38:12, 47:23, 61:9
**critical** [2] - 60:18, 60:25
**cross** [3] - 4:7, 22:5, 25:1
**CROSS** [1] - 13:5
**cross-examination** [2] - 22:5, 25:1
**CROSS-**

**EXAMINATION** [1] - 13:5
**cross-examine** [1] - 4:7
**crossed** [1] - 46:20
**crucial** [1] - 24:5
**Cruser** [2] - 4:9, 67:7
**current** [1] - 59:25
**custody** [9] - 27:6, 27:9, 44:8, 63:4, 63:15, 63:22, 66:10, 67:6
**dad** [7] - 7:14, 7:19, 7:22, 8:20, 9:8, 9:12, 9:15
**dad's** [1] - 13:12
**dangerous** [3] - 29:10, 36:1, 64:6
**dated** [1] - 6:12
**daycare** [1] - 7:4
**days** [2] - 30:5, 65:2
**deal** [3] - 30:10, 41:12, 47:24
**dealer** [3] - 29:25, 30:10, 30:14
**dealers** [5] - 26:12, 29:22, 35:23, 38:1, 38:12
**deception** [1] - 43:13
**decide** [1] - 53:7
**deciding** [1] - 20:6
**decision** [6] - 29:3, 33:16, 58:14, 60:4, 60:5, 65:1
**decision-making** [2] - 33:16, 60:4
**decisions** [2] - 60:6, 60:7
**defendant** [53] - 3:13, 21:15, 21:24, 22:3, 22:9, 22:22, 23:2, 23:8, 23:13, 23:22, 24:7, 24:12, 25:18, 25:21, 26:25, 27:6, 27:9, 27:11, 28:2, 28:4, 28:8, 29:8, 29:12, 29:15, 30:2, 30:4, 30:22, 31:1, 31:19, 31:24, 31:25, 32:6, 32:9, 33:1, 33:3, 33:7, 33:14, 33:20, 34:10, 34:15, 35:6, 35:25, 36:13, 56:7, 56:18, 57:6, 57:12, 57:16, 58:3, 59:10, 59:14, 62:10, 62:24
**DEFENDANT** [5] - 3:15, 53:18, 54:2, 55:25, 64:22

**defendant's** [13] - 21:25, 23:24, 26:3, 26:11, 26:25, 29:4, 32:7, 33:1, 34:7, 34:24, 59:16, 60:10, 66:16
**defense** [4] - 5:8, 19:18, 27:16, 27:21
**DEFENSE** [1] - 5:13
**defer** [3] - 36:12, 43:6, 43:12
**deficits** [1] - 33:4
**degree** [5] - 34:14, 43:13, 49:10, 49:13, 53:6
**demonstrate** [3] - 23:24, 33:17, 33:21
**denial** [1] - 24:21
**denied** [6] - 24:14, 24:22, 25:6, 25:13, 43:20
**denies** [1] - 26:18
**deny** [1] - 26:16
**denying** [2] - 24:5, 57:13
**depart** [1] - 34:10
**Department** [1] - 31:5
**departure** [2] - 34:7, 52:8
**depression** [1] - 59:24
**deprivation** [1] - 49:15
**derives** [1] - 40:12
**designated** [1] - 65:21
**destructive** [2] - 30:19, 64:5
**detail** [2] - 24:3, 24:15
**detailed** [2] - 21:6, 29:14
**determined** [2] - 66:19, 67:2
**determines** [1] - 45:11
**determining** [1] - 60:15
**deterrence** [4] - 38:19, 47:5, 60:22, 62:10
**devices** [2] - 30:19, 64:5
**diabetes** [1] - 34:18
**dictated** [2] - 62:9, 64:4
**died** [1] - 9:8
**difference** [3] - 24:3, 24:6, 46:23
**different** [16] - 16:14, 23:1, 24:1, 24:11, 29:21, 34:20, 39:11, 40:23, 45:3, 47:22, 48:6, 50:15, 51:20, 51:22, 53:2, 59:22
**differently** [2] - 45:21,

50:15
**difficult** [5] - 20:6, 37:3, 52:7, 62:15, 68:5
**diminished** [3] - 34:25, 49:7, 53:4
**dinner** [1] - 12:17
**DIRECT** [1] - 6:1
**direct** [1] - 22:4
**directed** [2] - 58:24, 64:7
**directions** [1] - 5:12
**directly** [2] - 21:23, 40:10
**disagree** [1] - 27:15
**disagreed** [1] - 29:1
**disagrees** [2] - 23:23, 27:4
**discord** [1] - 49:2
**discount** [1] - 37:15
**discover** [1] - 9:24
**discovered** [2] - 9:25, 29:17
**discussing** [1] - 49:10
**dispute** [4] - 4:16, 43:13, 51:7, 57:21
**disputed** [2] - 57:22, 58:4
**disqualified** [1] - 61:17
**disregarded** [1] - 29:9
**distinction** [2] - 44:18, 44:19
**distinguishes** [1] - 34:14
**distraught** [1] - 55:19
**distributing** [3] - 30:1, 34:2, 67:23
**DNA** [1] - 64:7
**doctor** [2] - 33:17, 55:15
**documents** [1] - 32:24
**done** [9] - 9:14, 9:17, 11:4, 12:14, 32:19, 49:25, 54:9, 55:25
**doomsday** [1] - 41:2
**double** [1] - 8:5
**doubt** [1] - 61:1
**down** [10] - 8:6, 11:3, 19:14, 37:22, 40:13, 44:13, 54:20, 55:8, 57:20, 61:20
**downward** [2] - 34:7, 34:10
**Doyle** [4] - 44:3, 44:4, 44:7, 44:20
**Dr** [3] - 32:19, 33:6, 33:12
**drama** [1] - 6:5
**draw** [1] - 44:18

**draws** [3] - 44:19, 48:11, 48:12
**dressed** [2] - 55:20, 55:21
**dresses** [1] - 42:5
**driven** [1] - 16:18
**driver** [1] - 31:11
**driver's** [1] - 35:11
**driving** [4] - 9:7, 17:16, 18:3, 32:10
**drug** [10] - 29:22, 29:25, 30:10, 30:14, 38:1, 38:12, 41:12, 61:16, 64:3
**drugs** [3] - 30:12, 31:7, 50:14
**due** [3] - 34:7, 59:25, 63:8
**DUI** [1] - 44:25
**during** [16] - 16:21, 22:9, 23:2, 25:1, 27:6, 28:5, 30:1, 31:6, 49:7, 51:22, 56:13, 56:14, 56:16, 59:5, 63:17, 66:1

**easiest** [1] - 21:23
**easily** [1] - 23:12
**easy** [2] - 54:18, 67:18
**economic** [4] - 36:24, 38:15, 40:14, 61:2
**economics** [2] - 37:4, 38:10
**editor** [2] - 48:20, 48:21
**educational** [1] - 60:23
**effect** [2] - 4:21, 8:1
**effective** [1] - 47:18
**either** [5] - 3:20, 4:8, 45:1, 53:25, 61:14
**elbow** [2] - 55:9, 55:10
**elderly** [1] - 34:10
**electrician** [5] - 7:24, 8:3, 8:9, 8:16
**elements** [2] - 24:10, 57:13
**Elmore** [1] - 48:17
**elsewhere** [1] - 61:14
**embezzlement** [1] - 45:6
**end** [3] - 36:9, 36:10, 67:24
**ended** [5] - 10:2, 29:12, 29:15, 29:21, 36:1
**ends** [1] - 11:21
**engage** [1] - 44:6
**engaged** [1] - 62:8
**enhance** [2] - 40:9, 42:20

**enjoy** [2] - 41:17, 41:18
**enjoyed** [2] - 46:8, 50:18
**enormous** [1] - 52:6
**ensure** [1] - 35:23
**entered** [1] - 65:3
**entire** [2] - 32:22, 39:5
**entirely** [3] - 34:1, 47:21, 53:25
**entitled** [1] - 26:21
**environment** [1] - 45:20
**err** [1] - 43:3
**error** [1] - 20:1
**especially** [4] - 7:15, 12:12, 16:10, 54:18
**essential** [1] - 57:13
**essentially** [8] - 24:16, 30:10, 35:20, 39:14, 39:18, 44:12, 51:23, 61:21
**establish** [1] - 49:12
**established** [1] - 56:14
**establishment** [1] - 37:10
**estimate** [2] - 56:6, 56:19
**estimating** [1] - 14:17
**et** [1] - 38:19
**evaluation** [3] - 32:19, 33:2, 59:25
**event** [2] - 52:4, 59:3
**evil** [1] - 32:13
**exact** [1] - 28:24
**exactly** [2] - 15:5, 15:7
**EXAMINATION** [3] - 6:1, 13:5, 18:13
**examination** [3] - 22:4, 22:5, 25:1
**examine** [1] - 4:7
**example** [2] - 35:22, 37:8
**exceeds** [1] - 21:19
**except** [3] - 32:9, 36:24, 38:11
**excommunicated** [1] - 12:23
**excuse** [3] - 35:18, 49:8, 49:23
**excuses** [1] - 28:9
**existing** [1] - 41:5
**expect** [1] - 20:22
**expectations** [1] - 51:23
**Expedition** [4] - 18:2, 18:3, 18:4, 18:5
**experience** [2] - 52:6, 52:22

**explain** [2] - 37:5, 48:15
**explanation** [4] - 26:9, 26:11, 49:23, 61:24
**explicitly** [1] - 46:12
**extra** [3] - 8:3, 8:13, 11:16
**extremely** [1] - 53:1
**face** [1] - 50:16
**facility** [5] - 51:25, 66:16, 66:18, 66:24, 67:3
**facing** [2] - 47:7, 47:10
**fact** [15] - 12:21, 13:21, 22:25, 25:4, 27:19, 29:3, 29:11, 29:15, 37:6, 38:6, 42:6, 56:18, 56:20, 57:5, 65:14
**factor** [3] - 32:8, 43:20, 47:5, 58:24, 59:17
**factors** [11] - 29:5, 36:21, 38:18, 39:12, 58:11, 58:23, 60:17, 61:5, 62:6, 62:17, 67:14
**facts** [7] - 21:4, 21:5, 24:19, 26:4, 27:9, 33:18, 48:10
**factual** [2] - 57:13, 58:4
**factually** [1] - 4:16
**fail** [1] - 66:12
**failed** [1] - 52:19
**failing** [1] - 51:5
**fair** [1] - 67:21
**fairly** [2] - 22:4, 30:24
**fake** [1] - 48:23
**fall** [1] - 6:14
**false** [1] - 24:21
**falsely** [3] - 24:5, 24:14, 25:13
**family** [12] - 7:1, 7:16, 32:11, 36:24, 41:17, 45:14, 50:6, 52:20, 54:5, 56:11, 56:22, 68:4
**Fancy** [1] - 6:7
**far** [5] - 21:19, 24:11, 54:24, 55:14, 59:2
**fashioning** [1] - 58:23
**father** [6] - 7:13, 7:22, 9:11, 59:19
**favor** [1] - 46:18
**features** [1] - 61:1
**federal** [7] - 28:7, 28:14, 28:21, 28:25, 31:22, 32:15, 48:4,

56:17, 58:12, 64:1, 67:6
**fell** [1] - 6:4
**felon** [9] - 12:10, 12:22, 29:25, 30:25, 31:4, 31:11, 32:5, 52:23, 54:12
**felons** [9] - 12:8, 29:22, 35:24, 39:7, 40:18, 48:9, 54:13, 54:15, 61:15
**felons'** [1] - 41:14
**felony** [4] - 32:15, 38:1, 45:1, 47:7
**few** [3] - 9:6, 56:2, 57:3
**FFL** [2] - 28:16, 40:25
**FFLs** [3] - 23:1, 23:4, 23:15
**fight** [1] - 10:13
**file** [4] - 43:25, 44:5, 65:2, 65:6
**filed** [6] - 3:19, 19:24, 27:7, 27:18, 27:22, 64:12
**filing** [1] - 20:1
**fill** [2] - 59:13, 61:23
**final** [1] - 65:12
**finally** [2] - 23:8, 60:17
**Financial** [1] - 63:12
**financial** [3] - 11:12, 13:8, 13:12
**financier** [1] - 13:12
**findings** [1] - 58:9
**fine** [6] - 20:10, 36:12, 36:15, 36:18, 63:9, 63:10
**fire** [1] - 30:12
**firearm** [15] - 30:13, 30:16, 30:18, 30:21, 31:1, 31:13, 35:23, 37:18, 42:2, 42:4, 42:17, 45:2, 47:19, 56:17, 59:9
**firearms** [44] - 21:17, 21:19, 21:24, 22:3, 22:7, 22:10, 22:23, 22:25, 23:17, 24:23, 28:7, 28:14, 28:21, 28:25, 29:9, 29:12, 29:21, 30:16, 33:10, 34:3, 34:5, 35:6, 35:8, 35:24, 36:1, 38:6, 38:13, 40:17, 41:12, 42:3, 56:7, 56:9, 56:15, 59:1, 59:3, 59:4, 59:6, 59:11, 61:7, 61:17, 64:5, 67:19, 67:21
**first** [11] - 5:7, 7:15,

8:6, 20:16, 21:17, 32:20, 35:10, 54:2, 58:24, 64:1, 65:23
**fit** [1] - 48:2
**five** [1] - 10:1
**fled** [1] - 31:12
**flip** [1] - 37:2
**focused** [1] - 43:17
**foibles** [1] - 50:4
**follow** [4] - 15:21, 35:21, 36:11, 58:16
**followed** [1] - 38:16
**following** [4] - 4:21, 62:18, 63:25, 64:14
**follows** [2] - 43:15, 63:2
**forces** [1] - 45:24
**Ford** [1] - 18:2
**forever** [1] - 8:12
**forfeiture** [3] - 65:8, 65:9, 65:13
**forget** [1] - 55:15
**Form** [1] - 59:6
**forma** [1] - 65:4
**forms** [1] - 59:13
**forth** [2] - 41:21, 60:17
**forward** [2] - 5:10, 7:15
**four** [4] - 10:1, 52:9, 52:10, 59:18
**frame** [1] - 56:13
**frankly** [7] - 20:2, 20:4, 24:13, 27:10, 29:16, 33:2, 51:11
**Frankly** [1] - 22:3
**Fred** [1] - 23:4
**frequent** [1] - 46:2
**friends** [7] - 8:21, 12:6, 12:8, 25:16, 25:19, 25:21, 59:20
**frightened** [1] - 52:3
**fringe** [2] - 41:19, 45:15
**frisked** [1] - 16:10
**front** [3] - 21:5, 45:4, 48:8
**full** [3] - 48:16, 49:8, 63:15
**full-sail** [1] - 49:8
**fully** [1] - 39:6
**functioning** [1] - 49:14
**furtherance** [2] - 42:2, 42:3
**future** [1] - 64:3
**Fyffe** [11] - 3:16, 4:1, 4:18, 5:24, 15:20, 18:12, 20:22, 36:19, 62:13, 66:14
**FYFFE** [21] - 3:18,

3:22, 4:4, 4:19, 4:24, 5:8, 5:25, 6:2, 18:14, 19:2, 19:18, 20:25, 37:1, 37:12, 38:24, 39:4, 42:15, 43:2, 43:6, 66:20, 67:13
**gang** [2] - 31:5, 31:14, 31:15
**gangs** [1] - 31:15
**Gaytan** [2] - 24:1, 24:7
**general** [2] - 7:7, 64:10
**gifts** [5] - 22:3, 22:6, 23:10, 56:11, 56:22
**girls** [1] - 6:7
**given** [6] - 38:17, 40:6, 57:9, 61:1, 62:5
**glad** [2] - 13:9, 13:14
**goal** [1] - 46:3
**goodness** [1] - 54:21
**Goods** [1] - 24:23
**googled** [1] - 48:23
**government** [33] - 3:25, 5:4, 19:22, 20:5, 21:13, 21:15, 23:20, 23:23, 24:4, 24:8, 24:10, 26:16, 26:20, 27:1, 27:4, 27:19, 29:4, 30:8, 31:22, 32:8, 32:17, 33:23, 34:6, 34:15, 34:23, 35:7, 43:14, 44:6, 44:9, 46:11, 48:12, 49:5, 57:12
**government's** [2] - 43:16, 43:24
**grandchildren** [1] - 59:20
**greater** [3] - 59:2, 60:20, 62:20
**greed** [2] - 34:1, 34:4
**gross** [1] - 63:17
**grow** [2] - 29:17, 29:19
**guess** [11] - 5:4, 11:20, 14:17, 20:8, 32:17, 33:20, 36:13, 37:9, 41:24, 56:2, 61:12
**guidance** [1] - 52:20
**Guideline** [1] - 34:9
**guideline** [3] - 48:1, 58:7, 58:22
**guidelines** [8] - 34:8, 36:10, 36:22, 53:3, 56:8, 57:10, 58:8, 58:19
**guilt** [1] - 57:14
**guilty** [6] - 43:15, 46:22, 47:8, 59:14,

62:24, 63:1
**gun** [37] - 9:17, 9:20, 11:7, 14:13, 18:1, 22:10, 25:3, 25:7, 25:17, 25:21, 26:7, 26:12, 30:7, 30:9, 31:8, 32:1, 37:16, 37:20, 37:22, 38:2, 40:3, 40:25, 41:6, 41:15, 41:17, 42:9, 42:11, 45:13, 45:21, 46:16, 54:14, 54:25, 61:21, 61:25, 62:3, 68:2
**guns** [81] - 9:9, 9:14, 9:17, 10:2, 10:4, 10:7, 10:12, 14:9, 14:10, 14:12, 14:18, 14:20, 14:23, 14:25, 22:6, 22:8, 22:13, 22:16, 22:17, 22:20, 22:21, 23:4, 23:10, 23:11, 23:14, 25:2, 25:7, 25:9, 25:21, 26:18, 29:10, 29:14, 29:15, 29:16, 29:17, 30:3, 30:5, 31:17, 32:5, 34:2, 35:11, 35:14, 35:16, 35:24, 37:13, 37:25, 39:12, 39:16, 39:24, 40:2, 40:5, 40:21, 41:9, 41:13, 42:7, 43:3, 43:9, 47:12, 48:14, 49:5, 54:12, 54:25, 55:3, 56:6, 56:12, 56:21, 57:1, 57:3, 57:5, 57:19, 59:8, 61:8, 61:12, 61:25, 62:2, 62:4, 67:23, 68:2, 68:3
**guy** [2] - 9:10, 48:21
**guys** [2] - 15:12, 41:15
**half** [2] - 6:22, 61:12
**handled** [1] - 52:18
**hands** [10] - 29:10, 29:13, 29:21, 36:1, 38:6, 40:18, 41:14, 61:9, 62:4, 67:24
**hard** [17] - 8:4, 8:9, 8:10, 8:17, 8:18, 9:4, 12:1, 12:4, 12:11, 12:13, 19:10, 35:3, 38:4, 38:17
**hardly** [2] - 11:6, 11:8
**hardworking** [1] - 46:18
**harm** [1] - 46:6
**Hatzenbuehler** [6] - 32:19, 32:21, 33:6,

33:12
**head** [1] - 39:6
**health** [14] - 10:16, 34:8, 34:16, 34:25, 35:2, 36:24, 51:6, 52:7, 60:10, 60:11, 60:14, 61:2, 66:17, 66:18
**healthy** [1] - 46:7
**hear** [6] - 3:3, 19:21, 20:15, 20:18, 39:9, 53:20
**heard** [6] - 8:24, 11:25, 21:8, 25:14, 43:7, 45:23
**hearing** [2] - 6:21, 49:12
**heart** [1] - 20:2
**help** [4] - 4:9, 7:8, 9:5, 49:25
**helped** [1] - 11:2
**helpful** [1] - 33:2
**helps** [3] - 55:20, 55:21
**hereby** [1] - 63:2
**Hewlett** [1] - 13:11
**Hi** [15] - 22:8, 22:10, 22:15, 22:18, 22:21, 22:22, 22:24, 24:23, 25:18, 32:5, 37:7, 39:12, 39:16, 42:24
**Hi-Point** [2] - 24:23, 32:5
**Hi-Points** [13] - 22:8, 22:10, 22:15, 22:18, 22:21, 22:22, 22:24, 25:18, 37:7, 39:12, 39:16, 42:24
**high** [3] - 6:5, 34:18, 62:2
**himself** [3] - 23:11, 24:13, 52:18
**hip** [1] - 6:12
**history** [6] - 32:7, 32:9, 32:16, 59:16, 59:23
**hit** [1] - 54:19
**hits** [1] - 39:20
**hmm** [1] - 18:5
**hobbies** [1] - 46:9
**hobby** [3] - 40:3, 45:14, 46:4
**hold** [2] - 15:15, 15:17
**home** [9] - 7:2, 7:4, 7:9, 7:15, 45:5, 51:9, 52:15, 52:17, 53:8
**hopefully** [1] - 3:6
**hoping** [1] - 34:4
**horrible** [4] - 38:25, 39:22, 41:13, 50:20

**horrified** [1] - 52:3
**hotcakes** [3] - 22:11, 32:6, 37:8
**hours** [3] - 39:9, 63:22
**house** [15] - 8:6, 9:19, 10:22, 13:19, 13:23, 14:5, 15:11, 16:7, 18:25, 19:1, 19:3, 19:6, 36:14, 36:15, 64:16
**housed** [1] - 66:18
**housekeeping** [1] - 56:3
**humbling** [1] - 52:22
**humiliated** [1] - 55:23
**humiliation** [1] - 54:5
**hundreds** [1] - 30:19
**hurdle** [1] - 39:22
**hurt** [3] - 33:23, 33:24, 34:4
**husband** [3] - 8:20, 12:10, 17:15
**ID** [1] - 37:24
**idea** [3] - 18:22, 36:13, 52:23
**identified** [4] - 38:8, 38:16, 39:4, 39:11
**ignore** [1] - 35:25
**ignoring** [1] - 38:11
**ill** [3] - 38:2, 38:13, 61:16
**illegal** [3] - 33:10, 61:7, 67:21
**illegally** [1] - 61:15
**illogical** [1] - 50:5
**images** [1] - 30:19
**immediately** [2] - 63:8, 66:10
**impact** [3] - 36:24, 52:2, 61:3
**impaired** [2] - 35:2, 50:14
**impermissible** [2] - 44:6, 44:17
**impermissibly** [2] - 27:1, 27:16
**important** [2] - 44:23, 51:15
**importantly** [2] - 27:5, 27:25
**impose** [5] - 53:9, 58:20, 62:11, 62:18, 68:7
**imposed** [8] - 53:6, 63:14, 63:25, 64:8, 64:21, 64:25, 65:25, 67:14
**imposing** [1] - 60:19
**imprisonment** [2] - 53:10, 63:19

**inability** [1] - 51:16
**incapacitated** [1] - 50:10
**incapacity** [1] - 50:16
**incarcerated** [1] - 11:24
**incarceration** [2] - 64:25, 67:15
**including** [2] - 26:18, 31:14
**income** [6] - 4:20, 10:23, 11:11, 11:12, 11:23, 63:17
**inconsistencies** [1] - 24:22
**inconsistent** [3] - 25:6, 25:11, 26:4
**incontinence** [1] - 51:10
**increase** [3] - 50:5, 53:5, 56:8
**indeed** [2] - 62:6, 62:15, 62:19
**indicated** [4] - 17:7, 17:8, 32:12, 59:5
**indicating** [1] - 60:1
**indications** [1] - 60:4
**indictment** [4] - 3:10, 59:15, 63:1, 65:9
**indifferent** [1] - 33:25
**individual** [1] - 62:7
**individually** [1] - 34:12
**individuals** [1] - 67:22
**infection** [1] - 38:25
**infections** [1] - 51:12
**infer** [1] - 44:16
**infirm** [5] - 34:11, 34:17, 34:22, 51:8
**information** [6] - 21:10, 32:20, 35:12, 35:16, 48:22, 48:24
**infringement** [1] - 27:23
**inheritance** [8] - 4:25, 8:25, 9:3, 13:22, 13:24, 13:25, 18:16, 60:9
**initial** [1] - 48:3
**Inmate** [1] - 63:12
**inquire** [1] - 3:13
**insight** [1] - 36:19
**institution** [1] - 65:21
**institutional** [1] - 51:12
**integrate** [1] - 33:15
**intend** [1] - 3:20
**intended** [3] - 33:23, 33:24, 54:12
**intent** [9] - 42:19,

42:22, 42:23, 43:17, 43:22, 57:16, 57:21, 58:5
**intention** [2] - 54:4, 54:23
**intentionally** [1] - 39:7
**intentions** [1] - 41:10
**interacted** [1] - 49:3
**interacting** [1] - 46:9
**interested** [1] - 6:9
**interruption** [1] - 16:25
**interview** [2] - 32:23, 32:25
**intricacies** [1] - 45:25
**introduce** [1] - 27:21
**introduced** [1] - 21:18
**inventory** [3] - 22:1, 22:14, 22:19
**investigate** [1] - 37:19
**investigation** [2] - 3:11, 3:14
**investigations** [1] - 38:9
**investigative** [1] - 48:7
**investment** [2] - 56:10, 56:21
**invoked** [2] - 27:2, 27:11
**involved** [9] - 21:18, 22:7, 22:21, 26:19, 57:6, 59:1, 59:3, 61:9, 61:16
**involving** [1] - 67:21
**issue** [12] - 3:8, 26:3, 27:17, 38:15, 43:25, 44:21, 47:15, 48:15, 57:17, 57:22, 58:1, 58:4
**issues** [5] - 5:3, 10:16, 51:1, 60:9, 66:17
**items** [1] - 31:7
**itself** [2] - 51:13, 52:6
**Jacob** [1] - 13:11
**jail** [1] - 55:4
**jealous** [1] - 26:13
**jerk** [1] - 6:6
**jewelry** [1] - 10:6
**job** [4] - 6:10, 9:5, 11:16, 32:13
**jobs** [3] - 8:3, 8:15, 49:19
**journeyman** [1] - 8:16
**judge** [1] - 50:13
**Judge** [5] - 4:12, 18:10, 36:2, 36:9, 48:8
**judgment** [7] - 35:2, 49:21, 50:21, 52:18,

63:4, 64:12, 65:2
**jump** [1] - 8:24
**JUNE** [1] - 5:13
**jurisdictions** [1] - 67:19
**jury's** [1] - 24:20
**Kaiser** [1] - 8:8
**keep** [5] - 10:19, 29:10, 35:15, 35:16, 55:15
**kept** [2] - 44:24, 45:2
**key** [1] - 47:5
**kids** [10] - 7:5, 7:20, 8:17, 8:19, 9:18, 9:22, 11:2, 11:18, 45:19
**killed** [1] - 30:15
**kind** [14] - 6:6, 6:9, 6:11, 7:13, 7:22, 8:18, 12:18, 14:20, 32:12, 33:6, 37:18, 37:23, 39:8, 62:8
**kinds** [1] - 60:6
**knees** [1] - 8:10
**knowing** [2] - 36:3, 38:7
**knows** [1] - 32:24
**Kondo** [3] - 25:16, 25:20, 26:6
**Kondo's** [1] - 25:19
**Kren** [2] - 29:23, 29:25
**Kren's** [2] - 30:4, 30:6
**laboring** [1] - 38:21
**lack** [5] - 33:14, 36:25, 41:10, 61:3, 63:9
**land** [1] - 41:13
**Larry's** [4] - 24:23, 25:7, 37:12, 37:13
**last** [5] - 5:18, 5:21, 49:6
**law** [24] - 24:18, 28:7, 35:20, 35:21, 36:4, 36:8, 40:22, 41:21, 42:16, 42:21, 45:20, 45:25, 46:7, 46:19, 46:23, 47:4, 55:2, 60:21
**law-abiding** [1] - 45:20
**lawful** [3] - 41:18, 43:18, 45:14
**lawfully** [1] - 40:3, 43:10, 56:10
**Lawrence** [1] - 29:23
**laws** [1] - 35:23, 38:11, 54:15
**lay** [1] - 55:7
**LDS** [1] - 12:21
**least** [8] - 14:8, 15:10, 37:19, 38:20, 56:12,

59:1, 61:25, 66:17
**leave** [3] - 12:17, 65:4, 67:1
**lectern** [2] - 4:10, 4:14
**led** [1] - 48:10
**left** [2] - 21:25, 57:17
**legal** [4] - 41:20, 58:1, 65:6
**legs** [1] - 55:14
**length** [1] - 53:6
**lengthy** [1] - 31:17
**lens** [1] - 49:4
**less** [6] - 30:22, 37:22, 42:13, 57:5, 63:13, 63:17
**lesson** [1] - 48:22
**letter** [2] - 48:20, 48:21
**letters** [3] - 47:14, 59:20, 59:21
**level** [4] - 23:22, 51:9, 56:8, 57:9
**license** [9] - 24:17, 28:7, 28:14, 28:21, 28:25, 33:11, 35:11, 44:15, 59:12
**licensed** [1] - 59:8
**licensees** [1] - 56:17
**licenses** [1] - 46:22
**life** [4] - 12:12, 43:10, 46:18, 49:24
**lifer** [1] - 9:10
**like-minded** [2] - 35:7, 35:18
**likewise** [3] - 20:22, 28:14, 34:23
**limine** [1] - 47:15
**line** [2] - 46:21, 56:25
**lines** [1] - 47:13
**list** [3] - 27:19, 60:11
**listed** [1] - 27:19
**listen** [1] - 15:18
**listening** [1] - 47:21
**live** [1] - 52:15
**lived** [2] - 46:17, 49:24
**lives** [1] - 12:7
**living** [2] - 12:2, 51:12
**local** [2] - 37:22, 64:1
**location** [1] - 66:20
**Lodge** [1] - 48:8
**logged** [1] - 31:7
**longest** [1] - 39:6
**longstanding** [1] - 40:16
**look** [1] - 13:10
**looked** [6] - 7:14, 28:13, 28:16, 28:21, 28:25, 40:24
**looking** [4] - 14:15,

46:23, 50:22, 65:17
**looks** [2] - 18:2, 45:8
**loophole** [1] - 55:1
**Los** [1] - 30:18
**lose** [1] - 7:23
**loss** [1] - 50:19
**lost** [1] - 6:22
**love** [5] - 6:4, 6:8, 6:14, 50:17, 59:19
**loved** [4] - 7:20, 9:17, 9:20, 9:22
**loving** [2] - 6:15, 6:17
**low** [5] - 36:9, 36:10, 46:13, 62:1, 64:2
**low-end** [1] - 36:9
**lower** [3] - 23:6, 36:22, 51:23
**lowest** [1] - 62:7
**luck** [2] - 67:17, 68:4
**lucky** [1] - 7:21
**ma'am** [2] - 5:10, 18:9
**main** [1] - 40:4
**maintain** [1] - 66:4
**major** [1] - 59:17
**majority** [1] - 59:11
**malicious** [2] - 33:17, 33:21
**man** [2] - 41:11, 49:23
**Man's** [1] - 6:7
**mandatory** [1] - 58:19
**marginal** [1] - 39:1
**mark** [4] - 25:23, 25:24, 39:24, 40:7
**markdown** [1] - 39:13
**markup** [3] - 37:16, 42:18, 61:22
**married** [2] - 6:13, 59:18
**marshals** [1] - 51:22
**material** [1] - 57:21
**materials** [1] - 48:7
**matter** [6] - 25:25, 44:7, 45:8, 45:22, 49:15, 58:9
**matters** [1] - 56:3
**mean** [15] - 8:20, 12:1, 12:13, 12:14, 20:4, 37:5, 40:5, 40:19, 41:8, 42:7, 47:23, 48:9, 50:15, 54:7, 55:6
**meaning** [2] - 31:14, 36:3
**means** [5] - 33:22, 35:20, 51:8, 51:13, 61:14
**meant** [7] - 33:22, 46:5, 46:6, 46:7, 48:2, 53:3
**Medicaid** [1] - 51:9

**medical** [8] - 49:10, 50:23, 50:24, 50:25, 60:24, 66:18, 66:22, 67:1

**medication** [2] - 10:17, 50:25

**medications** [2] - 51:24, 60:12

**meeting** [1] - 6:4

**members** [3] - 31:15, 56:11, 56:22

**memo** [1] - 44:19

**memoranda** [1] - 19:24

**memorandum** [3] - 26:25, 29:6, 40:19

**memory** [2] - 42:9, 49:14

**mental** [1] - 34:25

**mentally** [4] - 38:2, 38:13, 55:18, 61:16

**mentioned** [2] - 11:11, 22:25

**mentions** [1] - 25:20

**merely** [2] - 24:8, 35:6

**mess** [2] - 28:10, 55:18

**met** [1] - 66:22

**meth** [2] - 45:10

**methamphetamine** [3] - 30:1, 31:2, 31:3

**Meyer** [1] - 23:4

**microphone** [4] - 4:9, 4:10, 4:14, 39:3

**middle** [1] - 45:23

**might** [2] - 25:4, 41:19

**mill** [1] - 8:7

**mind** [1] - 45:2

**minded** [2] - 35:7, 35:18

**minds** [1] - 46:8

**minimizes** [1] - 26:17

**minor** [1] - 32:10

**minute** [2] - 53:19, 54:24

**minutes** [2] - 53:21, 56:2

**Miranda** [6] - 27:5, 27:10, 43:25, 44:1, 44:4, 44:20

**miscommunications** [1] - 20:8

**misdemeanor** [2] - 32:10, 45:1

**misread** [1] - 20:2

**missing** [1] - 32:1

**mission** [1] - 44:15

**mistakes** [1] - 8:22

**mitigate** [1] - 33:9

**mitigating** [5] - 36:6,

43:19, 61:1, 61:5, 62:6

**mixture** [1] - 42:22

**model** [2] - 18:2, 23:14

**Modesto** [1] - 30:8

**mom** [1] - 13:11

**moment** [9] - 3:7, 15:18, 15:25, 16:2, 17:2, 17:4, 17:5, 62:21

**money** [9] - 8:13, 10:12, 10:13, 11:3, 13:20, 13:21, 13:22, 19:2, 25:5

**monitor** [1] - 11:17

**month** [4] - 11:13, 11:18, 12:2, 63:17

**monthly** [1] - 14:4, 63:16

**months** [7] - 11:21, 30:25, 31:8, 36:10, 51:17, 58:7, 63:5

**moreover** [1] - 56:20

**morning** [1] - 55:20

**most** [7] - 21:23, 22:14, 27:5, 47:10, 57:3, 57:11, 61:1

**mostly** [1] - 7:2

**mother** [4] - 9:8, 9:19, 14:4, 18:24

**motion** [6] - 27:7, 27:18, 27:22, 43:25, 44:5, 47:15

**motivated** [2] - 34:1, 41:4

**motives** [2] - 33:17, 33:22

**move** [5] - 4:9, 7:10, 17:7, 41:23, 55:6

**MS** [21] - 3:18, 3:22, 4:4, 4:19, 4:24, 5:8, 5:25, 6:2, 18:14, 19:2, 19:18, 20:25, 37:1, 37:12, 38:24, 39:4, 42:15, 43:2, 43:6, 66:20, 67:13

**murder** [3] - 30:7, 30:9, 30:14

**must** [3] - 65:2, 65:23, 66:6

**name** [5] - 5:15, 5:18, 5:21, 35:11

**names** [1] - 35:15

**nature** [1] - 44:23, 58:25

**necessarily** [1] - 43:14

**necessary** [4] - 47:5, 60:11, 60:20, 62:20

**neck** [1] - 55:11

**need** [16] - 3:6, 13:10, 15:20, 20:14, 25:23, 36:23, 38:22, 44:4, 44:10, 44:20, 51:6, 54:9, 55:11, 56:2, 61:22, 65:12

**needed** [4] - 8:14, 24:17, 46:22, 60:23

**needs** [11] - 7:10, 7:11, 11:17, 40:15, 42:17, 55:10, 55:13, 58:1, 66:22, 67:1

**neighbors** [1] - 7:7

**never** [16] - 12:5, 27:6, 27:7, 27:8, 27:17, 27:18, 27:21, 27:22, 28:13, 39:20, 47:1, 52:23, 54:4, 54:12, 54:23

**nevertheless** [1] - 68:4

**New** [1] - 48:14

**new** [3] - 16:3, 18:4, 40:7

**newer** [1] - 18:2

**news** [1] - 48:23

**next** [1] - 48:20

**night** [1] - 55:21

**nine** [1] - 10:2

**nominal** [2] - 37:15, 63:13

**noncommittal** [1] - 33:7

**none** [1] - 56:24

**normally** [1] - 66:15

**note** [1] - 36:13

**noted** [4] - 21:21, 24:3, 53:1, 67:16

**nothing** [3] - 10:24, 13:18, 49:24

**notice** [2] - 65:2, 65:6

**notified** [2] - 65:21, 66:5

**NRA** [1] - 9:10

**number** [23] - 21:17, 21:19, 21:21, 22:3, 22:16, 23:1, 23:6, 23:7, 26:18, 27:4, 27:12, 27:20, 29:17, 29:19, 36:21, 39:11, 51:10, 57:3, 58:15, 59:21, 61:8, 67:22

**numbers** [2] - 23:14, 48:1, 59:2

**numerous** [6] - 23:4, 24:12, 24:22, 29:11, 31:6, 32:15

**nursing** [1] - 51:9

**Oakland** [2] - 31:5, 31:8

**oar** [1] - 38:21

**oath** [2] - 4:11, 5:11

**Obama** [1] - 55:1

**object** [3] - 4:13, 21:13, 67:14

**objection** [8] - 5:1, 21:17, 23:21, 23:23, 57:7, 57:8, 58:5

**objections** [15] - 3:19, 3:21, 3:23, 4:15, 20:13, 20:16, 20:23, 21:3, 21:8, 21:15, 21:16, 26:21, 41:25, 48:14, 56:3

**objectives** [1] - 62:21

**obligated** [1] - 53:25

**obtain** [2] - 37:25, 61:14

**obtained** [1] - 59:12

**obtaining** [1] - 38:13

**obviously** [2] - 59:16, 59:24

**occasion** [1] - 16:6

**occasional** [2] - 46:2, 62:1

**occupants** [1] - 64:18

**occurred** [2] - 34:24, 61:25

**occurs** [1] - 44:9

**Ochoa** [2] - 24:1, 24:7

**Ochoa-Gaytan** [2] - 24:1, 24:7

**odd** [1] - 61:8

**offender** [2] - 30:17, 52:25

**offense** [18] - 21:18, 22:7, 26:19, 33:10, 34:24, 42:3, 42:4, 42:7, 44:24, 44:25, 45:2, 49:7, 53:4, 56:8, 58:25, 60:21, 62:12, 66:12

**offenses** [2] - 32:15, 50:11

**offer** [1] - 49:22

**offering** [1] - 41:8

**office** [5] - 20:9, 51:22, 63:24, 64:17, 66:4

**Office** [1] - 65:22

**OFFICER** [1] - 67:10

**officer** [5] - 24:24, 25:8, 47:2, 64:7, 64:18

**officers** [2] - 31:25, 45:19

**often** [2] - 14:15, 58:12

**old** [7] - 8:7, 8:23, 16:18, 16:19, 32:9,

34:16, 59:17

**once** [3] - 40:4, 49:18, 51:24

**ones** [3] - 22:18, 23:5, 50:16

**online** [1] - 54:19

**open** [1] - 55:16

**operated** [2] - 55:8, 55:9

**operating** [1] - 50:11

**operations** [1] - 54:9

**opinion** [1] - 10:19

**opportunity** [6] - 3:14, 23:9, 23:18, 46:16, 53:15, 53:23

**oppose** [1] - 34:23

**opposed** [2] - 31:22, 47:19

**order** [3] - 24:24, 63:2, 65:12

**ordered** [6] - 3:10, 63:7, 64:9, 65:20, 66:7, 66:13

**Oregon** [2] - 66:16, 67:3

**origin** [1] - 40:11

**Orleans** [1] - 48:14

**otherwise** [8] - 4:10, 23:16, 37:25, 38:2, 60:4, 61:17, 64:3, 68:3

**outlined** [2] - 62:21, 64:12

**outreach** [1] - 47:17

**outside** [1] - 52:1

**overboard** [1] - 8:25

**overcome** [1] - 39:22

**overdid** [1] - 8:19

**overheard** [1] - 26:10

**overhears** [1] - 26:1

**overlook** [1] - 67:7

**overlooked** [1] - 65:15

**overrule** [4] - 21:16, 26:20, 57:7, 58:5

**overtime** [2] - 8:3, 8:14

**overwhelming** [1] - 23:20

**own** [11] - 16:11, 16:12, 16:14, 16:17, 17:8, 44:15, 52:15, 52:19, 52:20, 58:8

**p.m** [5] - 53:22, 68:9

**page** [1] - 26:24

**paid** [13] - 13:19, 13:20, 13:21, 14:8, 14:21, 14:24, 15:13, 17:20, 18:25, 34:2, 36:14, 37:14, 63:15

**pain** [5] - 34:19, 49:18,

50:23, 50:24, 50:25
**pamphlet** [1] - 42:16
**pamphlets** [1] - 47:14
**papers** [2] - 37:23, 64:17
**paperwork** [3] - 13:9, 41:1, 61:23
**paragraphs** [1] - 57:8
**paralyzed** [1] - 54:8
**pardon** [4] - 5:20, 6:19, 13:1, 14:11
**part** [13] - 6:6, 9:5, 13:23, 14:3, 19:2, 24:21, 26:10, 42:7, 46:7, 47:25, 49:2, 56:24, 60:8
**part-time** [1] - 9:5
**participate** [1] - 63:11
**particular** [1] - 45:25
**particularly** [2] - 37:18, 49:6
**party** [3] - 6:10, 21:2, 38:20
**passed** [3] - 9:8, 14:4, 18:24
**past** [1] - 34:20
**patrolled** [1] - 47:3
**pattern** [1] - 60:3
**pauperis** [1] - 65:4
**pay** [7] - 13:23, 14:5, 19:2, 63:7, 63:9, 64:7, 65:3
**paying** [1] - 16:12
**payment** [1] - 8:6
**payments** [6] - 16:13, 18:8, 36:14, 63:13, 63:16, 64:9
**PayPal** [1] - 54:19
**peers** [1] - 62:25
**people** [34] - 6:17, 7:7, 7:8, 7:9, 12:21, 16:17, 29:23, 30:11, 35:7, 35:15, 35:18, 35:24, 37:17, 37:19, 37:25, 38:13, 41:6, 41:16, 46:8, 46:21, 47:17, 48:18, 48:25, 49:16, 49:17, 49:25, 50:13, 54:13, 58:11, 59:22, 61:24, 62:1
**per** [2] - 63:13, 63:17
**percent** [1] - 63:10
**performed** [2] - 33:3, 33:4
**perhaps** [5] - 4:9, 21:23, 36:6, 39:13, 60:25
**period** [5] - 18:23, 54:21, 56:16, 66:1, 67:15

**permissible** [1] - 40:10
**person** [16] - 4:7, 4:16, 6:16, 12:18, 31:3, 32:14, 32:23, 46:23, 46:25, 47:2, 48:6, 49:18, 51:15, 63:23, 64:16
**personal** [2] - 56:10, 56:21
**perspective** [2] - 41:22, 49:4
**pertain** [1] - 3:23
**PETERSON** [1] - 5:13
**Peterson** [1] - 5:17
**phrase** [1] - 37:23
**physical** [2] - 34:8, 34:12
**physically** [1] - 55:18
**pick** [1] - 58:14
**pig** [1] - 45:18
**pistol** [8] - 30:2, 31:1, 31:4, 31:6, 31:10, 31:20, 31:23, 32:4
**pistols** [1] - 29:20
**place** [7] - 5:11, 8:8, 29:10, 38:12, 66:6, 66:15, 66:22
**placed** [2] - 4:11, 63:19
**placement** [1] - 66:24
**play** [1] - 28:10
**played** [1] - 6:6
**playing** [1] - 40:8
**plea** [1] - 20:15
**point** [17] - 7:23, 12:21, 21:23, 22:8, 23:8, 23:24, 24:25, 26:23, 26:24, 28:8, 28:13, 28:15, 33:20, 41:3, 50:16, 58:19, 67:1
**Point** [2] - 24:23, 32:5
**pointed** [2] - 28:6, 31:17
**points** [3] - 21:10, 43:14, 56:22
**Points** [2] - 22:8, 22:10, 22:15, 22:18, 22:21, 22:22, 22:24, 25:18, 37:7, 39:12, 39:16, 42:24
**police** [6] - 29:16, 31:12, 31:21, 31:25, 45:18, 47:1
**Police** [1] - 31:5
**political** [1] - 49:2
**poor** [6] - 33:16, 51:1, 51:4, 52:18, 60:3, 61:2

**poorly** [1] - 52:18
**pornography** [1] - 30:20
**pose** [1] - 64:2
**position** [1] - 67:23
**possess** [1] - 64:4
**possessed** [2] - 23:16, 30:9
**possessing** [1] - 61:17
**possession** [6] - 30:4, 30:6, 30:17, 30:21, 31:2, 67:21
**possibility** [1] - 29:19
**possible** [3] - 16:20, 43:22, 66:25
**possibly** [2] - 52:15, 62:7
**pot** [1] - 49:1
**pot-stirrer** [1] - 49:1
**potential** [5] - 5:2, 36:15, 36:16
**pounds** [1] - 31:2
**powers** [1] - 41:20
**practicing** [1] - 48:4
**preBooker** [1] - 52:9
**precisely** [1] - 43:3, 61:20
**prefer** [3] - 4:5, 4:16, 5:4
**premises** [1] - 64:19
**prepare** [1] - 65:6
**prepper** [1] - 41:2
**prerogative** [1] - 54:1
**present** [7] - 23:9, 23:13, 24:9, 24:12, 34:13, 41:25, 43:22
**presented** [6] - 21:8, 22:2, 23:12, 23:20, 24:13, 28:17
**presentence** [9] - 3:10, 3:14, 3:20, 21:14, 21:20, 48:13, 56:4, 56:5, 58:8
**presenting** [1] - 21:3
**preserved** [1] - 58:1
**President** [1] - 55:1
**pressure** [1] - 34:19
**pretrial** [4] - 65:24, 66:1, 66:3, 66:5
**pretty** [5] - 8:8, 10:5, 12:11, 33:7, 38:18
**price** [2] - 37:14, 37:20
**primarily** [2] - 4:19, 44:21
**primary** [5] - 39:16, 42:19, 42:23, 46:3
**prison** [10] - 12:3, 12:22, 47:10, 51:14,

51:17, 52:4, 52:10, 52:12, 53:6, 61:3
**Prisons** [3] - 63:5, 63:23, 65:21
**private** [1] - 40:20
**privilege** [1] - 66:9
**probation** [5] - 31:14, 52:17, 63:23, 64:7, 64:18, 66:4
**Probation** [1] - 65:22
**PROBATION** [1] - 67:10
**problem** [5] - 37:24, 55:2, 56:11, 61:6
**problems** [6] - 12:5, 12:6, 34:16, 35:2, 60:12, 60:15
**proceed** [2] - 21:11, 58:2
**proceeding** [1] - 65:9
**Proceedings** [1] - 68:9
**proceedings** [2] - 64:13, 65:10
**process** [3] - 52:5, 52:14, 58:13
**product** [1] - 37:21
**profit** [8] - 39:15, 42:6, 42:19, 42:22, 42:23, 46:3, 62:3, 67:23
**Program** [1] - 63:12
**promote** [1] - 60:21
**pronounce** [1] - 62:23
**proof** [1] - 57:13
**proper** [2] - 20:7, 62:15
**property** [1] - 64:16
**prosecuted** [1] - 29:24
**prosecution** [2] - 47:7, 47:16
**prosocial** [2] - 41:18, 45:10
**protect** [2] - 38:12, 62:9
**protecting** [1] - 38:18
**protection** [1] - 60:22
**provable** [1] - 56:23
**proved** [1] - 21:24
**proves** [1] - 21:19
**provide** [3] - 60:22, 62:10, 67:3
**provided** [4] - 3:11, 21:10, 32:25, 46:16
**provides** [1] - 34:9
**providing** [1] - 38:19
**PSR** [1] - 41:25
**psychological** [2] - 32:18, 59:25
**public** [3] - 38:19, 60:23, 62:9

**pulled** [1] - 25:22
**punish** [1] - 52:17
**punishable** [1] - 40:2
**punishment** [7] - 36:8, 45:11, 47:5, 53:6, 53:7, 60:22, 62:11
**purchase** [2] - 28:6, 61:12, 68:3
**purchased** [29] - 14:10, 14:12, 14:14, 14:19, 21:24, 22:14, 22:19, 23:3, 23:15, 29:12, 29:15, 30:3, 30:4, 30:5, 30:13, 30:22, 31:1, 31:19, 40:6, 42:8, 42:10, 42:11, 56:10, 56:13, 56:16, 56:18, 56:21, 57:1, 57:19
**purchaser** [1] - 59:6
**purchasers** [2] - 35:23, 59:13
**purchases** [3] - 35:13, 54:18, 59:5
**purchasing** [4] - 22:10, 57:6, 59:1, 61:13
**pure** [1] - 34:4
**purpose** [2] - 57:2, 62:3
**purposes** [3] - 56:10, 56:21, 57:1
**pursuant** [2] - 63:3, 64:19
**pursue** [1] - 65:1
**pus** [1] - 55:16
**put** [10] - 12:3, 16:3, 19:7, 24:8, 24:10, 38:12, 40:19, 48:18, 66:23, 67:23
**puts** [3] - 38:4, 42:4, 57:12
**putting** [4] - 40:7, 40:8, 40:17, 62:3
**qualifies** [1] - 43:19
**qualify** [1] - 65:5
**quality** [2] - 33:9, 60:2
**quarter** [1] - 63:14
**questioned** [1] - 28:5
**questions** [12] - 5:2, 12:25, 13:2, 13:7, 13:13, 15:19, 15:23, 17:12, 18:11, 19:11, 36:17, 64:20
**quickly** [1] - 15:22
**quite** [7] - 23:12, 31:17, 31:18, 37:22, 53:13, 55:9, 59:21
**quote** [2] - 37:9
**radar** [1] - 39:8

**radiated** [1] - 6:16
**raised** [3] - 41:3, 43:8, 45:20
**raising** [2] - 7:20
**range** [3] - 14:3, 58:7, 58:22
**Ranger** [1] - 9:21
**rare** [1] - 57:11
**rather** [4] - 33:24, 53:17, 57:24, 58:15
**reach** [1] - 57:5
**reaction** [2] - 4:21, 4:24
**readily** [1] - 56:23
**real** [5] - 7:18, 22:4, 41:2, 41:22, 58:4
**realize** [1] - 54:17
**realized** [2] - 9:2, 39:18
**really** [24] - 7:11, 7:18, 8:2, 8:10, 9:4, 10:14, 10:18, 12:1, 12:11, 14:19, 16:9, 16:12, 25:2, 26:13, 33:18, 33:19, 36:7, 41:13, 46:13, 47:18, 56:25, 57:20, 58:20
**reamed** [1] - 55:12
**reason** [2] - 34:9, 35:22
**reasonable** [3] - 37:20, 58:23, 62:18
**reasons** [3] - 27:4, 35:9, 50:22
**rebut** [1] - 23:19
**rebuttal** [1] - 19:19
**receive** [2] - 11:12, 67:5
**received** [1] - 59:20
**receptiveness** [1] - 50:6
**recess** [3] - 53:19, 53:21, 68:8
**Recess** [1] - 53:22
**recklessly** [1] - 40:17
**recognize** [1] - 52:19
**recollection** [1] - 37:6
**recommend** [6] - 20:7, 36:9, 36:11, 66:14, 66:24, 67:5
**recommendation** [4] - 20:20, 20:24, 38:16, 66:15
**recommendations** [1] - 19:22, 20:19
**reconvene** [1] - 53:20
**record** [9] - 5:16, 5:19, 5:22, 26:24, 36:25, 38:1, 61:4, 67:13, 67:16

**recording** [5] - 25:8, 25:15, 25:16, 32:22, 32:23
**recordings** [2] - 27:20, 27:24
**records** [7] - 35:15, 43:17, 49:10, 49:16, 50:23, 50:24, 50:25
**recoup** [1] - 40:15
**recovered** [11] - 22:13, 22:20, 29:16, 30:17, 31:6, 31:8, 31:10, 31:18, 31:20, 31:24, 32:4
**recurrent** [1] - 51:11
**redirect** [2] - 15:21, 18:12
**REDIRECT** [1] - 18:13
**reduction** [3] - 23:23, 57:10, 57:11
**referenced** [1] - 45:18
**referring** [1] - 28:3
**reflect** [3] - 33:14, 60:20, 62:11
**Reform** [1] - 63:3
**regain** [1] - 51:16
**regarding** [1] - 43:24
**registered** [2] - 30:17, 31:23
**registry** [2] - 31:21, 31:23
**regular** [1] - 66:3
**rein** [1] - 50:6
**reiterate** [1] - 36:23
**reject** [1] - 35:8
**related** [3] - 3:21, 4:15, 29:14
**relates** [3] - 21:17, 24:25, 25:13
**relationship** [1] - 4:20
**release** [12] - 36:11, 63:15, 63:18, 63:19, 63:20, 63:22, 63:24, 64:11, 64:21, 64:24, 65:24, 66:9
**released** [2] - 52:16, 63:24
**relevant** [2] - 26:18, 56:13
**rely** [1] - 42:16
**remain** [11] - 27:2, 27:12, 27:17, 27:23, 28:1, 28:8, 28:12, 28:15, 28:19, 44:3, 44:17
**remember** [7] - 16:8, 16:9, 16:22, 17:3, 37:11, 43:2, 50:2
**remembers** [1] - 50:2
**rent** [2] - 10:23, 19:7

**repeat** [1] - 39:9
**repetitive** [1] - 28:6
**replaced** [2] - 8:11, 55:13
**report** [13] - 3:11, 3:14, 3:17, 3:20, 21:14, 21:20, 32:20, 56:4, 56:5, 58:8, 63:23, 66:3, 66:6
**reported** [1] - 32:2
**reporter** [2] - 16:25, 18:20
**representation** [1] - 65:6
**represents** [1] - 53:1
**request** [1] - 65:5
**require** [3] - 35:23, 59:13, 67:15
**required** [7] - 23:9, 23:18, 44:5, 58:16, 59:12, 63:16, 66:3
**requires** [1] - 62:5
**requiring** [1] - 24:4
**reread** [1] - 41:25
**resale** [2] - 28:6, 59:8
**resell** [3] - 23:17, 61:21, 62:2
**reselling** [1] - 57:6
**residence** [3] - 21:25, 30:2, 64:16
**resolve** [1] - 21:8
**resolved** [2] - 57:18, 65:10
**respect** [2] - 50:20, 60:21
**Responsibility** [1] - 63:12
**responsibility** [6] - 23:22, 23:25, 26:22, 43:12, 57:10, 57:23
**responsible** [1] - 56:7
**responsive** [1] - 50:7
**rest** [1] - 26:23
**result** [2] - 29:11, 35:25
**resulted** [2] - 33:16, 56:7
**retail** [2] - 61:21, 62:2
**retirement** [2] - 10:24, 11:23
**returned** [1] - 30:12
**reup** [1] - 37:9
**reupping** [1] - 37:10
**revealed** [1] - 48:7
**review** [3] - 3:14, 32:24, 60:11
**reviewed** [2] - 32:21, 59:19
**revoked** [1] - 66:10
**rid** [3] - 10:9, 16:17,

17:25
**rifles** [1] - 29:20
**rights** [1] - 27:5
**risk** [2] - 29:8, 64:2
**road** [1] - 47:1
**robbery** [1] - 45:5
**roof** [1] - 39:21
**rough** [1] - 8:8
**round** [1] - 48:18
**ruling** [1] - 20:19
**rulings** [2] - 20:13, 20:16
**run** [1] - 63:21
**sail** [1] - 49:8
**saint** [1] - 10:21
**sale** [2] - 37:7, 61:7
**sales** [2] - 40:20, 62:1
**sample** [1] - 64:7
**sat** [3] - 24:10, 24:14, 29:7
**satisfied** [1] - 63:1
**satisfy** [1] - 24:4
**saw** [2] - 10:8, 14:22
**scares** [1] - 51:11
**scene** [2] - 30:7, 30:14
**scenes** [1] - 29:16
**schedule** [1] - 64:9
**scheme** [2] - 42:16, 45:6
**school** [1] - 6:5
**search** [9] - 15:10, 16:6, 16:21, 17:15, 18:4, 28:5, 30:1, 31:6, 64:17
**searched** [2] - 16:6, 21:25
**searches** [1] - 64:19
**seat** [1] - 5:14
**seated** [1] - 65:16
**second** [4] - 20:1, 23:21, 26:10, 64:2
**Section** [2] - 34:9, 60:18
**security** [3] - 10:25, 11:14, 13:17
**seeing** [2] - 11:6, 41:11
**seeking** [1] - 44:1
**seem** [2] - 10:9, 37:23
**sees** [1] - 41:6
**seized** [3] - 22:18, 30:6, 30:21
**seizure** [1] - 48:14
**self** [3] - 50:20, 53:10, 66:9
**self-respect** [1] - 50:20
**self-surrender** [2] - 53:10, 66:9

**sell** [15] - 9:18, 10:6, 11:5, 22:10, 24:24, 25:3, 25:4, 25:10, 37:16, 39:20, 39:25, 41:4, 48:9, 61:25, 62:2
**selling** [20] - 10:9, 22:9, 22:11, 22:16, 22:23, 23:7, 30:12, 32:6, 33:11, 35:6, 35:10, 35:14, 35:18, 37:8, 39:7, 40:3, 40:7, 40:9, 54:25, 55:3
**sells** [1] - 42:5
**send** [1] - 55:4
**sense** [3] - 20:10, 26:14, 68:1
**sent** [2] - 59:21, 61:3
**sentence** [20] - 19:25, 20:7, 36:9, 36:22, 58:15, 58:21, 58:23, 60:16, 60:19, 62:6, 62:7, 62:16, 62:18, 62:19, 62:23, 64:25, 66:6, 66:12, 67:14, 68:6
**sentenced** [2] - 29:23, 29:24
**sentencing** [9] - 3:5, 26:25, 29:6, 49:12, 56:24, 58:10, 58:16, 58:23, 62:20
**Sentencing** [1] - 63:3
**separate** [2] - 42:9, 66:11
**serial** [1] - 23:14
**series** [1] - 60:7
**serious** [1] - 60:14
**seriousness** [3] - 48:17, 60:21, 62:11
**serve** [1] - 66:6
**served** [2] - 53:8, 63:6
**services** [2] - 66:3, 66:5
**set** [4] - 55:12, 60:17, 61:6, 62:6
**setting** [1] - 61:22
**seventy** [1] - 51:13
**several** [4] - 16:18, 35:8, 54:9, 65:23
**severity** [1] - 49:11
**sex** [1] - 30:17
**shaky** [1] - 52:13
**share** [2] - 18:25
**shared** [1] - 45:24
**sheer** [2] - 37:4, 47:11
**Sheridan** [2] - 66:15, 67:2
**shifts** [1] - 8:5

**shocking** [1] - 16:10
**shoot** [1] - 46:10
**shooting** [2] - 41:18, 47:22
**shootout** [1] - 30:11
**shoplifting** [1] - 46:14
**short** [6] - 3:22, 12:16, 30:24, 53:16, 53:18, 68:6
**shot** [1] - 30:12
**shoulder** [2] - 55:7, 55:13
**shoveled** [1] - 49:19
**show** [16] - 23:16, 25:3, 25:17, 25:21, 26:12, 32:13, 37:16, 37:21, 45:13, 45:21, 50:23, 50:24, 50:25, 54:25, 62:3, 68:2
**showed** [2] - 20:4, 56:15
**shown** [3] - 42:24, 56:24, 61:8
**shows** [16] - 9:18, 9:20, 9:25, 11:7, 18:1, 18:23, 22:11, 22:17, 32:20, 40:3, 41:6, 41:15, 41:17, 46:16, 54:14, 61:25
**shutting** [1] - 44:12
**side** [4] - 8:15, 37:2, 40:14, 43:4
**sight** [2] - 42:5, 42:12
**sights** [2] - 40:8, 43:1
**significant** [2] - 22:16, 39:13
**significantly** [1] - 52:17
**silence** [1] - 29:4
**silent** [12] - 27:2, 27:12, 27:17, 27:24, 28:1, 28:8, 28:12, 28:15, 28:19, 44:3, 44:8, 44:17
**similar** [2] - 46:9, 48:22
**similarly** [1] - 47:17
**simply** [16] - 24:10, 26:6, 28:20, 28:22, 32:14, 32:21, 35:1, 35:10, 37:25, 39:12, 39:24, 41:10, 42:8, 43:22, 48:12, 68:1
**single** [2] - 35:11, 40:22
**sister** [1] - 18:21
**sisters** [1] - 7:17
**sitting** [2] - 47:9, 55:6
**situated** [1] - 47:17
**situation** [3] - 10:15,

11:3, 54:3
**six** [1] - 30:25
**slanted** [1] - 47:20
**slap** [1] - 52:5
**sleep** [8] - 35:2, 35:3, 49:9, 49:15, 50:3, 50:24, 55:6
**slept** [1] - 49:17
**slightest** [1] - 35:19
**small** [2] - 7:18, 57:2
**snap** [1] - 52:11
**social** [3] - 10:24, 11:14, 13:17
**society** [4] - 45:8, 45:16, 46:6, 61:7
**socks** [1] - 55:14
**sold** [9] - 9:6, 25:18, 30:13, 39:14, 42:6, 42:13, 42:14, 42:18, 57:19, 59:10, 59:11
**someone** [4] - 4:2, 12:3, 26:1, 26:10, 27:5, 33:23, 33:24, 34:4, 37:20
**sometimes** [2] - 7:9, 8:5
**somewhat** [2] - 37:19, 49:23
**son** [4] - 7:3, 9:21, 45:23, 48:21
**sons** [1] - 45:17
**sorry** [11] - 14:2, 15:3, 15:7, 17:10, 17:13, 18:19, 38:25, 47:15, 54:23, 55:22, 55:23
**sort** [3] - 25:21, 33:4, 50:14
**sorts** [1] - 29:20
**sound** [1] - 47:23
**sounded** [2] - 47:21, 48:19
**source** [1] - 32:20
**southwestern** [1] - 66:25
**speaking** [2] - 4:4, 4:14
**Special** [4] - 25:16, 25:18, 25:20, 26:6
**special** [8] - 11:17, 25:2, 63:8, 63:14, 64:8, 64:10, 64:14
**specific** [5] - 22:4, 58:16, 59:7, 66:20
**specify** [1] - 42:9
**speculating** [1] - 14:20
**spell** [3] - 5:15, 5:18, 5:21
**spend** [3] - 37:20, 39:8, 51:6

**spending** [1] - 50:3
**spent** [6] - 4:25, 10:12, 14:8, 14:18, 14:21, 14:25
**spontaneous** [1] - 27:13
**Sporting** [1] - 24:23
**spring** [1] - 6:7
**stages** [2] - 7:19, 7:20
**stand** [2] - 5:14, 62:23
**standard** [2] - 51:25, 64:11
**standards** [1] - 51:9
**start** [5] - 6:3, 21:13, 39:24, 42:3, 44:10
**started** [4] - 10:1, 28:9, 39:18, 46:13
**starting** [1] - 19:22
**starts** [1] - 46:14
**state** [4] - 5:15, 10:19, 40:22, 64:1
**statement** [1] - 4:8
**statements** [7] - 17:11, 27:13, 27:14, 28:12, 28:19, 44:2, 49:2
**states** [2] - 33:2, 33:20
**States** [3] - 3:4, 38:9, 63:7
**statute** [2] - 58:16, 64:4
**statutory** [2] - 62:9, 62:20
**stay** [2] - 39:2, 44:8
**stayed** [1] - 7:2
**Steel** [1] - 8:8
**step** [4] - 4:8, 5:9, 5:10, 19:14
**stepdad** [1] - 50:4
**Steve** [27] - 6:4, 6:14, 7:1, 7:23, 8:25, 9:4, 9:11, 9:15, 11:15, 19:7, 39:7, 40:3, 40:23, 41:17, 42:2, 43:10, 45:25, 48:15, 48:25, 49:1, 50:10, 51:7, 52:3, 52:10, 52:18, 52:25
**Steve's** [3] - 11:23, 47:16, 49:7
**Steven** [2] - 3:4, 62:24
**still** [10] - 6:24, 17:18, 23:16, 27:21, 39:1, 41:20, 45:6, 55:11, 57:23
**stipulated** [1] - 43:17
**stirrer** [1] - 49:1
**stocks** [1] - 40:7
**stolen** [2] - 32:2, 45:7
**stop** [1] - 12:2

**store** [2] - 25:7, 37:22
**stores** [1] - 14:13
**story** [2] - 35:17, 45:17
**strong** [1] - 49:19
**strongly** [1] - 51:7
**struggle** [1] - 20:5
**struggled** [1] - 34:6
**struggling** [1] - 39:25
**stuff** [11] - 4:13, 4:15, 9:19, 9:22, 13:8, 14:15, 39:19, 41:2, 47:16, 55:16
**stupid** [1] - 39:19
**subject** [2] - 64:19, 66:12
**submit** [2] - 63:13, 64:16
**submitted** [4] - 42:17, 48:13, 49:11, 56:23
**substance** [2] - 59:24, 64:3
**substances** [1] - 45:9
**substantial** [7] - 23:19, 29:8, 37:16, 60:8, 61:4, 61:22, 62:5
**substantially** [1] - 53:5
**sudden** [2] - 19:7, 49:20
**suffering** [1] - 59:24
**suffers** [1] - 60:12
**sufficient** [3] - 51:19, 60:20, 62:19
**suggest** [2] - 36:21, 51:13
**suggested** [1] - 19:24
**suggestion** [2] - 61:18, 67:25
**superseding** [3] - 3:10, 59:15, 62:25
**supervised** [7] - 36:11, 63:18, 63:20, 63:24, 64:11, 64:21, 64:24
**supervision** [2] - 64:11, 64:15
**supplemental** [1] - 21:9
**support** [4] - 32:11, 35:1, 35:5, 59:22
**supporting** [1] - 7:1
**supports** [1] - 21:22
**suppose** [1] - 48:3
**supposed** [1] - 10:22
**suppress** [5] - 27:8, 27:22, 27:24, 43:25, 44:2
**surgeries** [1] - 34:19

**surrender** [5] - 53:10, 65:19, 65:20, 66:9, 66:13
**survival** [1] - 9:22
**survivalists** [1] - 9:23
**suspended** [1] - 64:4
**SUV** [5] - 17:16, 17:17, 17:18, 17:23, 17:25
**sworn** [1] - 4:17
**SWORN** [1] - 5:13
**system** [2] - 29:9, 35:25
**table** [2] - 10:6, 10:7
**tables** [2] - 10:1, 10:2
**talks** [2] - 34:12, 50:1
**target** [1] - 47:22
**tax** [2] - 37:24
**teach** [1] - 51:21
**technical** [1] - 3:8
**technically** [1] - 44:25
**ten** [2] - 53:19, 53:21
**ten-minute** [1] - 53:19
**tendencies** [1] - 50:5
**term** [6] - 40:16, 44:25, 53:9, 63:5, 63:18, 63:20
**terms** [11] - 31:13, 31:14, 41:24, 43:6, 43:12, 44:23, 49:7, 63:21, 63:25, 64:10, 64:24
**terrible** [2] - 12:23, 61:6
**testified** [7] - 24:16, 25:14, 26:5, 28:4, 28:15, 32:6
**testify** [2] - 4:19, 5:5
**testimony** [12] - 13:16, 21:9, 22:2, 23:2, 23:3, 24:25, 25:6, 25:11, 26:3, 28:24, 42:1
**testing** [2] - 49:13, 64:3
**theft** [4] - 45:4, 45:5, 45:8, 46:15
**themselves** [2] - 49:17, 49:18
**therefore** [2] - 63:9, 65:20
**thinking** [2] - 38:22, 44:24
**thinks** [1] - 41:4
**thoughts** [1] - 66:21
**three** [8] - 8:5, 16:8, 18:25, 31:8, 49:19, 52:12, 54:7, 55:11
**throat** [1] - 38:25
**throughout** [2] - 39:5, 65:25

**thumb** [1] - 55:10
**ties** [1] - 41:24
**tip** [1] - 12:17
**tipping** [1] - 12:18
**today** [4] - 6:25, 44:22, 47:8, 50:19
**together** [4] - 6:11, 42:12, 42:14, 43:21
**toll** [1] - 50:20
**took** [5] - 14:24, 29:18, 39:5, 50:8, 51:24
**topic** [1] - 34:23
**torn** [1] - 66:14
**total** [1] - 18:16
**touch** [2] - 4:20, 41:24
**tough** [2] - 8:2, 10:15
**toward** [1] - 63:14
**tracking** [1] - 42:14
**trafficking** [2] - 42:7, 61:16
**trained** [1] - 51:21
**training** [2] - 51:22, 60:23
**transaction** [1] - 47:20
**travels** [1] - 46:25
**treatment** [1] - 60:24
**trial** [27] - 21:9, 21:18, 22:2, 22:9, 22:25, 23:2, 24:8, 24:15, 25:11, 26:3, 27:21, 28:14, 29:7, 29:18, 32:3, 32:13, 35:12, 37:6, 42:1, 43:21, 56:14, 56:15, 57:13, 57:16, 57:18, 57:25, 58:2
**tried** [3] - 9:6, 27:24, 54:8
**trouble** [1] - 11:1
**troubling** [3] - 36:20, 41:9, 53:1
**true** [7] - 6:18, 6:20, 6:24, 6:25, 15:1, 33:9, 49:6
**truly** [1] - 68:6
**trust** [1] - 3:17
**truth** [2] - 51:15
**try** [9] - 9:5, 19:6, 25:1, 38:20, 38:21, 48:15, 58:12, 62:6, 62:15
**trying** [10] - 10:9, 10:12, 15:4, 21:5, 50:6, 55:1, 55:14, 55:16, 62:1, 68:2
**tunnel** [2] - 34:18, 55:8
**turn** [1] - 59:12
**turned** [1] - 39:14
**turning** [1] - 42:20

**twice** [1] - 40:4
**two** [17] - 6:12, 8:5, 10:7, 15:11, 16:5, 16:20, 17:24, 19:24, 21:15, 22:17, 23:22, 30:3, 30:22, 52:12, 55:11, 57:9, 60:7
**two-level** [2] - 23:22, 57:9
**type** [1] - 4:13
**types** [3] - 22:23, 29:21, 47:18
**typical** [4] - 34:14, 47:19, 52:25, 53:2
**typically** [3] - 15:19, 20:12, 57:24
**typographical** [1] - 20:1
**U.S** [3] - 60:18, 64:17, 65:22
**unable** [1] - 65:3
**uncomfortable** [1] - 65:17
**under** [9] - 4:11, 5:11, 26:14, 40:10, 43:20, 44:3, 49:6, 56:8, 58:7
**undercover** [6] - 22:14, 24:24, 25:2, 25:4, 25:8, 35:13
**understood** [1] - 13:16
**unglued** [1] - 45:18
**unit** [1] - 31:6
**United** [3] - 3:4, 38:9, 63:7
**universe** [2] - 41:4, 41:5
**unless** [4] - 4:3, 36:17, 62:3, 68:2
**unlike** [1] - 51:2
**unlikely** [1] - 63:11
**unsolicited** [1] - 27:13
**untreated** [2] - 49:9, 51:1
**unusual** [1] - 34:14
**up** [20] - 10:2, 11:21, 15:21, 28:4, 29:12, 29:15, 29:21, 36:1, 38:10, 39:24, 40:7, 42:5, 44:16, 46:13, 46:15, 48:10, 48:18, 55:6, 61:8, 67:24
**upset** [3] - 10:11, 10:21, 12:16
**upsetting** [1] - 12:20
**upstanding** [1] - 46:18
**urge** [1] - 53:8
**vague** [2] - 22:4, 50:1
**vast** [1] - 59:10

**vehicle** [3] - 31:11, 31:13, 64:17
**verdict** [3] - 43:15, 46:22, 47:8
**versus** [2] - 46:3, 47:2
**vertebra** [1] - 55:11
**victim** [2] - 30:9, 30:10
**Victorville** [1] - 31:19
**videos** [1] - 30:20
**view** [6] - 40:2, 40:3, 41:16, 42:8, 43:7, 45:20
**viewed** [1] - 41:19
**viewing** [1] - 40:23
**violate** [3] - 46:6, 64:23, 66:8
**violated** [2] - 35:19, 47:4
**violation** [6] - 24:18, 44:1, 44:4, 44:20, 44:21, 47:4
**vocational** [1] - 60:23
**voice** [3] - 6:22, 38:25
**volume** [8] - 37:4, 39:21, 40:12, 42:22, 47:11, 52:25, 53:1, 61:25
**voluntarily** [1] - 65:19
**volunteer** [1] - 17:11
**vs** [1] - 3:4
**waistband** [1] - 32:4
**waived** [1] - 63:10
**walk** [1] - 11:6
**Walmart** [3] - 23:4, 37:11, 61:21
**wants** [2] - 4:7, 66:21
**warn** [1] - 64:18
**warned** [2] - 44:8, 46:21, 47:10
**warning** [2] - 46:24, 59:7
**warrant** [3] - 15:10, 16:6, 16:21
**wasting** [1] - 60:8
**ways** [3] - 18:25, 20:17, 31:18
**weakening** [1] - 50:19
**weapons** [1] - 64:6
**wear** [2] - 52:11, 55:14
**week** [3] - 8:5, 13:21, 48:20
**weekend** [1] - 7:10
**weeks** [1] - 47:21
**weight** [1] - 32:18
**western** [1] - 38:9
**whatnot** [2] - 47:23, 48:23
**whole** [5] - 12:12, 33:18, 42:16, 52:4, 52:5

**wholesale** [1] - 37:10
**wife** [4] - 33:1, 54:5, 55:20, 61:3
**wife's** [1] - 60:8
**willful** [2] - 24:17, 26:17
**willfully** [4] - 29:9, 35:19, 36:2, 36:8
**willing** [1] - 37:17
**wish** [4] - 4:1, 65:1, 67:17, 68:4
**WITNESS** [14] - 5:13, 5:17, 5:20, 5:23, 13:14, 15:24, 16:1, 17:1, 17:3, 17:10, 17:13, 17:23, 18:21, 19:16
**witness** [6] - 3:22, 4:2, 5:7, 5:14, 16:3, 17:7
**witnesses** [4] - 3:20, 3:24, 19:17, 24:13
**wobbler** [1] - 44:24
**wonderful** [5] - 7:4, 7:14, 7:19, 8:19, 8:20
**word** [2] - 44:24, 45:1
**works** [1] - 46:15
**world** [2] - 47:25, 48:1
**worried** [1] - 35:7
**worse** [3] - 50:4, 52:11, 52:14
**worst** [1] - 51:11
**wrap** [1] - 39:6
**wrestled** [3] - 62:13, 62:14
**wrestling** [1] - 38:14
**wrist** [1] - 52:5
**written** [1] - 64:12
**year** [9] - 7:16, 11:21, 31:7, 36:11, 40:4, 40:6, 52:12, 63:20, 67:20
**years** [16] - 6:12, 8:7, 8:23, 9:9, 10:14, 16:8, 16:19, 30:22, 31:16, 32:9, 34:15, 48:4, 49:19, 52:10, 52:13, 54:7, 59:17, 59:18
**yes-or-no** [2] - 15:3, 17:6
**Young** [1] - 6:7
**young** [4] - 6:13, 7:16, 8:21, 9:18
**younger** [1] - 7:17
**youngest** [1] - 7:3
**yourself** [2] - 67:22, 67:23
**Zimmerman** [1] - 47:12